520 A.2d 349

**Gary D. SNYDER**

v.

**Edward J. GLUSING, Jr. et al.**

**No. 107, Sept. Term, 1986.**

Court of Appeals of Maryland.

Order Oct. 23, 1986.

Opinion Jan. 29, 1987.

Motion for Reconsideration Denied Nov. 5, 1986.

Edward L. Blanton, Jr., Kevin M. McGeady and Blanton & McCleary, on the brief, Towson, for appellant.

William W. Cahill, Jr., and Michael P. Smith, Weinberg & Green and W. Michel Pierson, on the brief, Baltimore, for appellees.

## ORDER

For reasons to be stated in an opinion later to be filed, it is this 23rd day of October, 1986.

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the October 15, 1986 order of the Circuit Court for Baltimore County entering judgment in favor of the appellees be, and it is hereby, affirmed, costs to be paid by the appellant. Mandate shall issue forthwith.

Submitted to MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

RODOWSKY, Judge.

This is a contested election case principally involving the nomination by the Republican Party of a candidate for State Senator from the Eighth Legislative District at the primary elections held September 9, 1986. Appellant, the unsuccessful candidate, asked that the election be set aside because a sample ballot distributed by the successful candidate violated the election laws. The trial court held that the appellant had failed to prove by clear and convincing evidence, as required by Md. Code (1957, 1986 Repl.Vol.), Art. 33, § 19–5, that the violation might have changed the outcome of the election. As hereinafter explained we shall hold that the trial court's factual determination was not clearly erroneous on this record.

This is the second appeal to this Court in this action.[1] The prior appeal was from a judgment entered in favor of the appellees on their motion for judgment made under Maryland Rule 2–519 at the end of the appellant's case. We reversed and remanded. *Snyder v. Glusing*, 307 Md. 548, 515 A.2d 767 (1986) (per curiam) (*Snyder* I). To present the issues on this appeal we must, after reviewing the general background, also review *Snyder* I in more detail than was necessary to explain our earlier decision.

## A. General Background

The Eighth Legislative District lies wholly within Baltimore County. It is bounded on the east by District 6 (Essex), on the south by District 7 (Sparrows Point), on the west by Baltimore City and by District 9 (Towson), on the

---

**1.** Article 33, § 19–4(3)(i) provides, as a result of amendments enacted by Ch. 755 of the Acts of 1985, that appeals in contested election cases "shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court."

northwest by District 10 (Cockeysville), and on the northeast by Harford County. The southernmost point of District 8 is the intersection of Philadelphia Road with the Baltimore City boundary. The district includes the communities of Rosedale, Kenwood, Fullerton, Parkville, Perry Hall, Carney, and Harford Hills. North of Gunpowder Falls it embraces the area northeast of Loch Raven Reservoir, south of Paper Mill and Sweet Air Roads, and west of Long Green Pike. There are eighteen precincts in the district. The polling places for those precincts are set forth on Attachment A hereto where the polling places are presented in generally a south to north order. There were 12,517 registered Republican voters in the Eighth District for the 1986 primary. Of these 3,357 or 26.82% voted. Two candidates vied for the Republican nomination for state senator from the district, the appellant, Gary D. Snyder (Snyder), and one of the appellees, Edward J. Glusing, Jr. (Glusing). Neither was the incumbent state senator, although Snyder was an incumbent member from the Eighth Legislative District of the Republican State Central Committee (the Committee).

Glusing was nominated by a majority of 196 votes, 1,327 to 1,131. Glusing carried the polling places by 1,313 to 1,088 while Snyder prevailed in the absentee ballots, forty-three to fourteen. The other appellee, Michael Kosmas (Kosmas), was elected to one of three seats on the Committee from the Eighth District.[2]

The sample ballot of which Snyder complains is a flyer printed in black ink on pink paper, eight and one-half inches by fourteen inches (the pink ballot). At the top left, in three-eighths inch high, bold type the pink ballot reads: "Support your *official* Republican ballot." (Italics in original). To the right of those words is a stylized figure of an

---

**2.** A precinct by precinct breakdown of the Senate election results and the results of the State Central Committee as to Snyder, Kuzniarski, and Kosmas is included here in Attachment A.

elephant with three stars on its back. This figure is very similar to the logo used by the Committee on its stationery. Next to the logo appear the words, "Maryland Republicans," in the same style of print used by the Committee for those words on its stationery. Below the above-described heading the pink ballot reads:

Endorsed by: [¼" high, bold type]

Congresswoman Helen Delich Bentley [⅜" high, bold type]

"Although my name will not be on the ballot today, as I am running unopposed in the Republican Primary, I need everyone's help in insuring my re-election in November. An important part of our success is having a strong slate of candidates, and I enthusiastically endorse all the candidates on this ballot ..." [⅛" high, regular type.]

/s/ *Helen Delich Bentley, M.C.*
Helen Delich Bentley,
Member of Congress

The pink ballot then sets out in quarter inch high, bold type certain offices, candidates, and lever numbers followed by the statement:

"Keep our Sitting Judges
MURPHY–NICKERSON–SMITH
PLEASE TAKE THIS BALLOT INTO THE BOOTH WHEN YOU VOTE!!"

On the lower righthand corner of the pink ballot, in hand lettering one-sixteenth inch high, appears: "Authority: Bernice Patterson, Treasurer." Bernice Patterson (Patterson) was designated with the State Administrative Board of Election Laws as Glusing's treasurer for his candidacy for state senate, but the pink ballot does not on its face reflect for whom Patterson was treasurer.

So far as the record in this case discloses there was one other sample ballot distributed in connection with the Re-

publican primary in the Eighth Legislative District. This ballot was printed in blue ink on a white card approximately eight and one-half inches high by three and one-half inches wide (the white ballot). The white ballot is headed: "REPUBLICAN BALLOT Tuesday, September 9, 1986." There follows a list of lever numbers, offices, and candidates. At the bottom righthand side of the white ballot, in print approximately one-sixteenth inch high, appear the words: "By Auth. Diane Cairns, Treas." Diane Cairns is the treasurer designated for the Snyder candidacy for state senator, but the white ballot does not on its face reflect for whom Cairns was treasurer.

The two sample ballots respectively endorsed the following:

|  | White Ballot | Pink Ballot |
|---|---|---|
| U.S. Senate | Linda Chavez | Linda Chavez |
| State Senate | Gary D. Snyder | Edward J. Glusing, Jr. |
| House of Delegates | Howard C. Harclerode<br>Alfred W. Redmer, Jr.<br>Scott A. Sewell | Al Redmer, Jr.<br>Scott Sewell |
| County Chairman, Committee | Richard D. Bennett | Richard D. Bennett |
| District Members, Committee | Marjorie J. Neuman<br>Gary D. Snyder | Michael Kosmas<br>Valerie A. Kuzniarski<br>Marjorie J. Neuman |
| Judges, Circuit Court | William M. Nickerson<br>Joseph F. Murphy, Jr.<br>James T. Smith, Jr. | Murphy<br>Nickerson<br>Smith |

There were five candidates seeking three nominations for the House of Delegates. The nominees were Scott A. Sewell (1,925 votes), Alfred W. Redmer, Jr. (1,661), and Howard C. Harclerode (948).

In the contest for Committee members Marjorie J. Neuman (Neuman) who was endorsed by both the pink and white ballots led the field of eleven with 1,504 votes. Snyder was second (955), Kosmas third (759), and Valerie A. Kuzniarski (Kuzniarski) fourth (734). Neuman was also unopposed to be the Republican nominee for the seat from the Sixth Councilmanic District on the Baltimore County Council. Neuman had included the white ballot in a mailing which she had made to registered Republican voters in the Eighth Legislative District seeking support for her Committee candidacy.

## B. *Snyder* I

Six days after the primary Snyder filed in the Circuit Court for Baltimore County a petition to void Glusing's nomination for state senator and Kosmas's election to the Committee.[3] Snyder had first learned the text of the pink ballot on primary day when he, together with Neuman, had visited each polling place in the Eighth District.

Snyder alleged that the pink ballot was false, fraudulent, deceptive, and in violation of Art. 33. Specifically, he alleged that Glusing, Kosmas, and Patterson violated § 11–3(b) which provides:

> It shall be unlawful for any organization other than the State central committee for the State to hold itself out as the official organization or governing body of any political party. Violation of this section is punishable by a fine of not more than one thousand ($1,000) dollars, or by

---

3. Article 33, § 19–2 permits
   any registered voter [to] seek judicial relief from any act or omission relating to an election ... on the grounds that the act or omission:
   (1) Is inconsistent with this article or other law applicable to the elections process; and
   (2) May change or have changed the outcome of the election.

imprisonment in jail for a period of six (6) months, or by both fine and imprisonment, in the discretion of the court. Snyder further alleged:

The ballot distributed by the Defendants was not approved or endorsed by Congresswoman Helen Delich Bentley; and the signature which purports to be hers was a forgery. Moreover, the ballot was not approved or endorsed by the party governing body, of the District, County or State. The purpose and effect of the ballot was to mislead the Republican voters of the Eighth Legislative District and to taint the purity of the election process.

The pink ballot, Snyder averred, by carrying the authority line of Glusing's treasurer, "falsely portray[ed] the Committee for which she acted as the State Central Committee for said District, County or State."

In his memorandum to the trial court Snyder also pointed out that the pink ballot violated § 26–16(a)(7) which in relevant part provides:

(a) *Enumerated.*—The following persons shall be guilty of prohibited practices and shall be punished in accordance with the provisions of this section:

. . . .

(7) Campaign Literature. Every person who ... causes to be published or distributed any ... sample ballot ... relating to or concerning any candidate ... for public or party office ... unless such ... sample ballot ... clearly indicates the name of the candidate or committee responsible for the literature and contains, but set apart therefrom, an authority line which shall [identify the treasurer].

At trial Snyder testified that he had observed the pink ballot being distributed at fifteen of the eighteen precincts in the district. It was not used at all at precincts 11–6, 14–6, and 14–9. Snyder said that he had prevailed upon the individuals electioneering at four other polling places to discontinue distributing the pink ballot, although neither he

nor Neuman knew whether distribution resumed after they left. These four precincts were 10–4, which they visited about 1:00 p.m., 14–7, about 3:45 p.m., 14–8, about 4:00 p.m., and 14–4, about 4:30 p.m.[4]

When the appellees moved for judgment at the conclusion of Snyder's case, the court and parties were in agreement that § 19–5 governed whether the requested relief could be granted. It provides in relevant part that

[u]pon a finding, based upon clear and convincing evidence, that the act or omission involved materially affected the rights of interested parties or the purity of the elections process and:

(1) Might have changed the outcome of an election already held, the court shall:

(i) Declare null and void the election for the office . . . involved and order that the election be held again on a date set by the court[.]

At that argument the claimed violation which received the most attention was the contention that the heading, "Support your *official* Republican ballot," violated § 11–3(b). Appellees relied heavily on *Culotta v. Raimondi,* 251 Md. 384, 247 A.2d 519 (1968) which held that an individual who caused a spurious "official" Republican sample ballot to be distributed did not violate § 11–3(b) because the conduct proscribed by that section is only that of an organization. Judge Finan, writing for the Court, explained:

It is quite obvious that the legislative intent expressed by § 11–3(b) is to reach the situation where there is a claim by an organization, other than the State Central Committee, that it is the official party organization. In the instant case the petition of the appellant alleges only that the appellee held himself out to be the candidate of the official party organization, without authority to do so. However, the petition nowhere contains any allegation that the appellee, or the appellee and those mentioned on

---

4. The polls were open from 7:00 a.m. to 8:00 p.m.

the sample ballot, were passing themselves off as the governing body of the Republican Party. There is no doubt that the purpose of the sample ballot in question was to deceive the public into thinking that the candidates whose names appeared thereon had received the official endorsement of the governing body of the Republican Party, namely the Republican State Central Committee. As censurable as such a political ruse may be, we find no specific prohibition of it, as presented by this case, in the statute. [*Id.* at 388, 247 A.2d at 521–22.]

Appellees argued that, under *Culotta,* Glusing could not as a matter of law violate § 11–3(b). That the failure to identify Glusing on the ballot as the candidate for whom Patterson was treasurer was a violation of § 26–16(a)(7) was uncontested.

Snyder further argued that he had met the burden of proving by clear and convincing evidence that the claimed violations might have changed the outcome of the election. In support of that proposition he pointed out that he had prevailed over Glusing (1) in the absentee ballots which were untainted by the pink ballot, (2) in the three precincts at which he said the pink ballot was not distributed at all (11–6, 14–6, and 14–9), and (3) in three of the four precincts at which he said the pink ballot was withdrawn from distribution during voting hours (14–4, 14–7, and 10–4).

The circuit court granted the defense motion. In an oral opinion the court explained as follows:

Moreover, I am not persuaded by clear and convincing evidence ... that absent the use of this ballot the outcome of the election *would* have been different. I don't believe that, based on the testimony that I've heard and in weighing that testimony under the clear and convincing evidence doctrine ... that the use of this ballot *changed* the outcome of this election. [Emphasis added.]

Snyder appealed. At oral argument of *Snyder* I the claimed violation of § 11–3(b) and the scope of *Culotta, supra,* again received considerable attention. When

pressed to answer whether § 11–3 was in the case, counsel for Snyder replied, "My case is under 26–16[a](7), your Honor, and I believe that is all we need to address as far as this case is concerned."

In *Snyder* I, *supra,* we reversed and remanded after holding that use of the pink ballot violated § 26–16(a)(7) and that the trial court had erred in requiring the appellant to show that the violation "would" have changed the election result. Because the trial court's use of an erroneous standard would not have required reversal if Snyder's evidence had been legally insufficient under a correct standard, we pointed out "that the appellant's proof, including the permissible inferences therefrom most favorable to the appellant, was legally sufficient to permit a fact finder to determine that the violation might have changed the outcome of the election." [5] *Snyder* I, *supra,* 307 Md. at 550, 515 A.2d at 768. This was a reference to Snyder's three pronged factual argument.

## C. The Judgment Appealed From

The per curiam opinion and mandate in *Snyder* I issued October 8, 1986. On October 14, 1986, trial of this action resumed. The appellees introduced evidence designed to undermine or attenuate causation. At the conclusion of all of the evidence, the trial court, ruling on the facts and the law, entered judgment for the appellees. In an oral opinion the court said:

> I've come to the conclusion that Article 33, Section 19–5 makes the standard clear and convincing evidence, which is precisely defined, has been defined to me in argu-

---

5. When commencing proceedings on remand the trial judge indicated concern that the above-quoted portion of the opinion in *Snyder* I conflicted with Maryland Rule 2–519(b) which authorizes a circuit court to "proceed, as the trier of fact, to determine the facts," when a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court. There is no conflict. On appellate review this Court could not exercise under a correct standard the fact-finding power which the trial court had exercised under an erroneous standard. We could test the necessity for a remand only under a sufficiency of the evidence approach.

ment.... [T]hat standard was created because I don't think the Legislature intended to empower a trial court judge to lightly throw out an election.... I think that the clear and convincing ... also applies to ["might have changed the outcome of an election already held"].

. . . .

It is up to this Court to determine on the evidence whether it is clear and convincing that the election in this case might have been different without the violation.

The violation in this case, I believe, is the failure to designate the candidate or committee for whom the treasurer acts as required by 26–16(a)(7).... And I am persuaded by clear and convincing evidence that there was an act or omission under Article 33 that involved— that was involved and materially involved the rights of interested parties and affected the purity of the elections process.

But I have no evidence, in my view, which is clear and convincing, that that violation, absent that violation, it might have changed the outcome of an election already held. And, therefore, I find for the defendants.

Snyder again appealed to this Court. The parties submitted on briefs. We affirmed by order entered October 23, 1986. We now set forth the reasons for that order.

### D. The Causation Analysis on Remand

On this appeal Snyder argues that the trial court applied too narrow an approach to the causation issue. Appellant claims that the circuit judge focused only on the defective authority line and failed to consider the ballot as a whole. Appellant submits that it is "the combined effect of the plain violation of § 26–16(a)(7) and the representations of official Republican status—whether or not those representations constitute a violation of Article 33, § 11–3—that deluded and deceived the voters and might have changed the outcome of the election." (Underscoring in original). We are satisfied that the trial court considered the effect of

the "official" sample ballot misrepresentation in its analysis.

■ Causation in this case is complicated by the fact that appellant did not brief and argue in *Snyder* I a contention that he had produced sufficient evidence to support a finding that an "organization," within the meaning of § 11–3(b), had distributed the pink ballot so as thereby to press § 11–3(b) as an independent ground for a violation. The issue is further complicated by appellant's concession in this Court that he stood exclusively on the violation of § 26–16(a)(7). The trial judge, as fact finder, was faced with the task of trying to determine whether the sole violation in the case, the failure to identify Glusing as Patterson's candidate, might have changed the outcome. In its analysis the court hypothesized the pink ballot with Glusing identified as Patterson's candidate. Within the framework of the same facts, but using a hypothetical, violation free ballot, the court tested whether Snyder might have won if Glusing was shown as Patterson's candidate, so that Glusing would not be able to deceive Republican voters, as Snyder argued, into believing persons endorsed by the pink ballot were the "official" Republican candidates. There was no legal error in using this approach to the complex causation problem. Under that approach the trial judge factually concluded that Snyder failed to prove, by clear and convincing evidence, that the result might have been different, but for the violation of § 26–16(a)(7).

The above analysis also was implicitly the basis of decision against Snyder on his claim that the election of Kosmas to the Committee should be nullified. That claim received scant, if any, attention in the proofs and arguments throughout. It is not separately addressed in Snyder's brief on this appeal.[6]

---

**6.** Thus, we need not address certain interesting questions which that claim presented. These included (1) whether Snyder, as a successful candidate for the Committee, can challenge the election of Kosmas to the Committee; (2) whether Snyder, relying on standing as a reg-

### E. Review of the Fact Finding

Appellant harks back to the same three pronged argument on the facts with which he successfully cleared our sufficiency of the evidence review in *Snyder* I concerning the outcome of the state senator nomination. But to succeed on this appeal he must demonstrate that the trial judge's factual determination was clearly erroneous. It is not.

The first factor to be considered is the degree of possibility or probability which the Legislature intended in § 19–5 when it authorized a court to nullify an election "[u]pon a finding, based upon clear and convincing evidence, that the act or omission involved ... [m]ight have changed the outcome[.]" Chapter 755 of the Acts of 1985 repealed and re-enacted the contested elections subtitle of the election code for the purpose, according to its title, "of creating a uniform procedure under which a registered voter may seek judicial relief from certain acts or omissions relating to an election[.]" Chapter 755 also repealed former § 26–18(a) through (f). This legislation was a response to *Duffy v. Conaway*, 295 Md. 242, 455 A.2d 955 (1983) which had held that § 26–18(d) unconstitutionally attempted to impose a nonjudicial function upon the judiciary in violation of Article Eight of the Maryland Declaration of Rights by, in effect, making a circuit court a fact finder which simply transmitted its findings to other branches of government for ultimate decision. Chapter 755 establishes a judicial remedy which the General Assembly has concluded, in an uncodified preamble to Ch. 755, "affords the fullest opportunity for providing a timely and adequate remedy[.]" That preamble

---

istered voter who complains of an election law violation in the pink ballot, can challenge only Kosmas's election to the Committee without challenging Neuman's election to the Committee when Neuman was also endorsed for a Committee seat by the pink ballot; and (3) whether Neuman is a necessary party defendant because her election to the Committee might be drawn into question by Snyder's contentions.

also declares that the statute should be liberally construed to effectuate its objectives.[7]

█ Section 19–5(1) requires a petitioner in a contested election case to demonstrate only that the violation complained of "might" have changed the outcome. Obviously the Legislature would have created an impossible burden were the petitioner required to show that the violation complained of changed the outcome of the election. The unqualified term, "might," however, ranges over a spectrum from the barest possibility to high probabilities which, depending on the context, could be just short of an absolute. Section 19–5 confines this range by requiring that the finding be "based upon clear and convincing evidence." We have said that proof is clear and convincing which enables "the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts." *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980). Consequently, a petitioner proves that an election law violation "might have changed the outcome" when the facts demonstrate a substantial probability that the outcome might have been changed.

We turn then to the facts most favorable to the appellees. Neuman testified that the pink ballot endorsements were agreed upon at a meeting called by Kosmas and held about three to four weeks before the election. The meeting was attended by Glusing, Patterson, Al Redmer, Kuzniarski,

---

7. The preamble to Ch. 755 in its entirety reads:
   The General Assembly of Maryland, recognizing that the timely determination of issues arising with respect to elections will facilitate the administration of elections, promote equity among interested parties, and enhance the confidence of the citizens of the State in the elections process, and recognizing that existing law does not uniformly provide for such determinations, and recognizing that the delayed determination of issues that may affect the outcome of elections often does not provide an adequate remedy, and concluding that a judicial determination of election-related issues affords the fullest opportunity for providing a timely and adequate remedy, enacts this statute for the purposes and objectives hereinabove mentioned and declares that it should be liberally construed to effectuate these purposes and objectives[.]

Kosmas, and Neuman. Kosmas handled preparation of the ballot. Those attending the meeting agreed that the ballot should be pink but Neuman testified that she warned Kosmas not to use the term "official." There was evidence that Kosmas had worked in the office of Congresswoman Bentley (we infer, as a volunteer) and there was no evidence Congresswoman Bentley had not endorsed the persons recommended by the pink ballot. It was uncontradicted that neither the Committee nor any county or district component thereof had endorsed the candidates recommended by the pink ballot. Indeed, the testimony was, and Snyder's counsel acknowledged at argument, that it is the traditional policy of the Committee not to endorse individuals in primary elections.

■ Our conclusion that the trial judge's finding was not clearly erroneous is perhaps best explained by reference to the contest for the Committee. The pink ballot recommended a full slate of three Committee candidates. Neuman, who was recommended by both the pink and white ballots, finished first with 1,504 votes. Snyder, who did not have the endorsement of the "official" ballot, finished second with 955 votes. Kosmas, who was listed first for the Committee on the "official" ballot, finished third with 759 votes. Kuzniarski, who was endorsed by the "official" ballot, lost, having received 734 votes. In the Eighth District Committee race Snyder finished ahead of both Kosmas and Kuzniarski in precinct 14–8 which Glusing carried by ten votes, in 14–1 which Glusing carried by four votes, in 11–8 which Glusing carried by eighteen votes, and in 11–7 which Glusing carried by nineteen votes. Snyder finished ahead of either Kosmas or Kuzniarski in 14–5 which Glusing carried by four votes, in 9–23 which Glusing carried by seventy-six votes, and in 10–2 which Glusing carried by twenty-nine votes. If the pink ballot were a significant factor, one would expect that Kosmas and Kuzniarski would do relatively as well against Snyder as did Glusing.

Glusing's largest majority, seventy-six votes, was in his home precinct, 9–23. Snyder lost his home precinct, 11–8, by eighteen votes although he carried his former home precinct, 14–6, by fifteen votes. He had moved to precinct 11–8 after the 1982 elections.

In addition, precinct 11–6 was one of those pointed to by Snyder in his factual analysis. He carried this precinct by twenty-four votes and attributed that to the absence of any distribution there of the pink ballot. In their case the appellees called a witness who testified that he had distributed the pink ballots at precinct 11–6 from 1:30 to 2:00 p.m., that he had been relieved by another volunteer, and that the witness returned at 3:30 p.m. and worked the polling place continuously until 8:00 p.m.

The strength of the causal connection between the violation and the election outcome was for the trier of fact to decide. In light of the conflicting inferences raised by simply the evidence reviewed above, we cannot say the trial judge was clearly erroneous in concluding that Snyder had not proven, by clear and convincing evidence, that, had there been no election law violation, the outcome might have been changed.[8]

---

8. No party to this appeal has questioned the power of the circuit court to consider the application for, or to grant, the relief requested here. Article III, § 19, of the Maryland Constitution provides: "Each House shall be judge of the qualifications and elections of its members...." That provision was discussed in *Lamb v. Hammond*, 308 Md. 286, 518 A.2d 1057 (1987) and *Duffy v. Conaway*, 295 Md. 242, 263 n. 14, 455 A.2d 955, 965 n. 14 (1983).

Without undertaking to define the scope of the constitutional provision, we are satisfied that it does not prevent the General Assembly from authorizing a court to set aside under statutorily defined circumstances the nomination in a primary election of a person as the candidate of a political party to stand for election in a general election for a seat in the Maryland Senate or in the House of Delegates, when, as here, the court action is instituted and decided before the general election. *See generally State ex rel. Gramelspacher v. Martin Circuit Court*, 231 Ind. 114, 107 N.E.2d 666 (1966); *Gralike v. Walsh*, 483 S.W.2d 70, 72–73 (Mo.1972); *Leu v. Montgomery*, 31 N.D. 1, 148 N.W. 662 (1914); *Comer v. Ashe*, 514 S.W.2d 730, 738 (Tenn.1974); *but see*

ATTACHMENT A

| PRECINCT NO. | POLLING PLACE | STATE SENATE | | MEMBER OF STATE CENTRAL COMMITTEE | | |
|---|---|---|---|---|---|---|
| | | Glusing | Snyder | Snyder | Kuzniarski | Kosmas |
| 14–9 | Rosedale American Legion Hall | | 22 | 28 (6) | 21 | 13 | 17 |
| 14–8 | Red House Run E.S. (10) | 40 | 30 | 27 | 17 | 24 |
| 14–5 | Shady Spring E.S. (4) | 32 | 28 | 20 | 12 | 21 |
| 14–7 | McCormick E.S. | 32 | 43 (11) · 23 | 15 | 15 |
| 14–6 | Elmwood E.S. | 26 | 41 (15) .48 | 6 | 4 |
| 14–3 | Eastern Regional Health Center | 53 | 56 (3) | 40 | 25 | 21 |
| 14–2 | Fullerton Fire House (24) | 51 | 27 | 26 | 39 | 31 |
| 14–4 | Fullerton E.S. | 71 | 80 (9) | 56 | 30 | 43 |
| 14–1 | Parkville M.S. (4) | 73 | 69 | 67 | 40 | 44 |
| 11–8 | Perry Hall E.S. (18) | 92 | 74 | 66 | 55 | 50 |
| 11–9 | Perry Hall S.H.S. (58) | 102 | 44 | 45 | 46 | 47 |
| 11–7 | Gunpowder E.S. (19) | 116 | 97 | 89 | 65 | 65 |
| 11–6 | Carney E.S. | 103 | 127 (24) 106 | 72 | 55 |
| 9–23 | Harford Hills E.S. (76) | 161 | 85 | 88 | 93 | 80 |
| 9–24 | Pine Ridge Grove E.S. | 79 | 80 (1) | 67 | 32 | 30 |
| 11–1 | Long Green Vol. Fire Co. (56) | 147 | 91 | 66 | 105 | 136 |
| 10–2 | Carroll Manor E.S. (29) | 68 | 39 | 36 | 35 | 41 |
| 10–4 | Fairview Church | 45 | 49 (4) | 30 | 25 | 28 |

ADKINS, Judge, dissenting in which ELDRIDGE and McAULIFFE, JJ., join.

The purportedly official pink ballot at issue in this case was published and distributed in violation of Art. 33, § 26–16(a)(7), which requires that sample ballots "clearly [indicate] the name of the candidate or committee responsible for" it. When he applied the clear and convincing evidence standard of § 19–5, the trial judge was "persuaded ... that there was an act or omission under Article 33 ... that ... materially involved the rights of interested parties and affected the purity of the elections process." He then found, however, a lack of clear and convincing evidence

*Allen v. Lelande,* 164 Cal. 56, 127 P. 643 (1912); *State ex rel. McGrath v. Erickson,* 203 Minn. 390, 281 N.W. 366 (1938).

"that that violation ... might have changed the outcome of an election...."

Like the majority, I have no quarrel with the standard of proof applied by the trial judge. In *Snyder v. Glusing*, 307 Md. 548, 550, 515 A.2d 767, 768 (1986) (*Snyder I*), we instructed that the appropriate standard of proof under Art. 33, § 19–5(1) requires " 'clear and convincing evidence, that the act or omission involved materially affected the rights of interested parties or the purity of the election process and *[m]ight* have changed the outcome of an election already held[.]' " The problem lies in the application of that standard. The majority op. at 422–423 is "satisfied that the trial court considered the effect of the 'official' sample ballot misrepresentation in its analysis." Were that the case, I once again would have no trouble. But that is not what the trial court did, as the majority opinion itself makes manifest: "The trial judge, as fact finder, was faced with the task of trying to determine whether the *sole violation* in the case, the failure to identify Glusing as Patterson's candidate, might have changed the outcome." *Id.* [emphasis supplied]. I believe that the scope of review the trial judge applied, and the majority has approved, results in an unduly narrow reading of Subtitle 19 of Art. 33, and, therefore, respectfully dissent from the causation analysis of the majority opinion.

The trial judge focused, and the majority focuses, on the "violation" of § 26–16(a)(7), and its potential effect on the outcome of the election. The letter and spirit of the law demand more than that. Under the circumstances present in this case, § 19–2 permits a registered voter to

"seek judicial relief from *any act or omission* relating to an election, whether or not the election has been held, on the grounds that the *act or omission:*

"(1) Is inconsistent with this article or other law applicable to the elections process; and

"(2) May change or have changed the outcome of the election [emphasis supplied]."

Section 19–5 authorizes the court to grant relief

"[u]pon a finding, based upon clear and convincing evidence, that the *act or omission* involved materially affected the rights of interested parties or the purity of the elections process and:

"(1) Might have changed the outcome of an election already held [emphasis supplied]."

These provisions do not even remotely suggest that the court's scope of review is limited solely to the effect of an election law violation. The plain language of the statutes instruct us that the law permits judicial relief from any act or omission inconsistent with Art. 33 or other law applicable to the elections process if the act or omission may have changed the outcome of the election.

This reading of the statute becomes particularly apparent when one contrasts with the language of Subtitle 19 the provisions of §§ 26–18(a) and 26–18(c) of Art. 33, which the Court had before it in *Culotta v. Raimondi,* 251 Md. 384, 247 A.2d 519 (1968). In *Culotta,* Judge Finan thought the spurious "official" ballot to be "censurable," but no judicial relief could be granted absent a violation of § 11–3(b). There was no violation because there was no allegation that the individual who had distributed the false ballot was an organization holding itself out to be the governing body of the Republican party. 251 Md. 388, 247 A.2d at 512–22. But at that time § 26–18(a) required a petition charging a fair election practice transgression to set forth a violation of "a specific section or sections of" Art. 33. And § 26–18(c) required the court to inquire into "such violations or failure to comply with the provisions of this article, as may be alleged in any such petition." Subtitle 19, which was enacted in its present form by Ch. 755, Acts of 1985, introduces a different and much broader approach. The focus now is not merely on specific violations but on "acts or omissions ... inconsistent with this article...."

In this case the failure to include on the pink ballot the name of the candidate or group responsible for it was certainly an "omission," and that, as we have seen, violated § 26–16(a)(7). But there was more. The distribution of the ballot falsely purporting to be the official Republican ballot was an "act" that without question affected the "purity of the election process." Indeed, the trial judge so found. He found, as well, that it "materially affected the rights of interested parties...." He then emasculated the remedial purposes of Subtitle 19 by abandoning any consideration of the offensive "act" and looked solely to the "omission" or "violation" in determining the possible effect of the chicanery on the election.

Because Subtitle 19 speaks of "acts or omissions" and not merely of "violations," it is clear to me that the legislature contemplated a broader scope of review than that applied by the trial judge and sanctioned by the majority. The majority opinion lends no meaningful recognition to the fact that in enacting these provisions the General Assembly was predominantly concerned with preserving the integrity of the electoral process by deterring deceptive and fraudulent election practices. In the present case this legislative design is defeated by limiting the scope of review solely to the effect of a technical election law violation.

If a political ruse of the sort present in this case violates a particular provision of the law, the reviewing court may certainly consider the effect of the violation on an election. But it must do more. It must look at the act of which the violation is a part. It is, therefore, irrelevant that Snyder has eschewed reliance on any violation of § 11–3(b). It may be that what was done here did in fact violate § 11–3(b). There was an "organization" consisting of several individuals ("any combination of two or more persons formed for the purpose of assisting the promotion of the success or defeat of any candidate ...," Art. 33, § 1–1(a)(12)), which by distributing the spurious official ballot, arguably held itself out as the Republican State Central Committee. But even if there was no actual violation of the letter of

§ 11–3(b), what was done here flouted the spirit of that subsection, and was, therefore, "inconsistent" with Art. 33.

Once Judge Jacobsen had found, by clear and convincing evidence, that distribution of the pink ballot, a violation of § 26–16(a)(7), was "an act or omission ... that ... materially involved the rights of interested parties and affected the purity of the elections process" he was required to do more than decide whether the technical violation might have affected the election. The proper scope of review under Subtitle 19 required him to consider whether the act of distributing a false official ballot to unwary voters in a manner at least inconsistent with § 11–3(b) might also have affected the outcome of the election. Had he applied the proper scope of review, the evidence before him was such as to require a finding, based on the totality of the circumstances, that distribution of the false official ballot might have affected the outcome of the election. I would reverse.

Judge ELDRIDGE and Judge McAULIFFE have authorized me to say that they join in this dissent.