862 A.2d 1

**Michael B. SUESSMANN et al.**

v.

**Linda H. LAMONE et al.**

**No. 140, Sept. Term, 2003.**

Court of Appeals of Maryland.

Nov. 17, 2004.

698

700

702

David R. Rocah (Deborah A. Jeon and Richard D. Griffiths of American Civil Liberties Union Foundation of Maryland, Baltimore), on brief, for appellants.

Michael D. Berman, Deputy Chief of Litigation (J. Joseph Curran, Jr., Attorney General of Maryland, Judith A. Armold and Melissa S. Whipkey, Assistant Attorneys General, Baltimore: Cynthia Panos, California; James C. Praley, Glen Burnie), on brief, for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE, and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

RAKER, J.

This is an action seeking declaratory and injunctive relief from the allegedly unconstitutional exclusion of unaffiliated voters from the Democratic and Republican Parties' primary elections for circuit court judicial candidates. Appellants seek to enjoin certification of the results of the primary election for judicial offices held on March 2, 2004 and an order directing the St. Mary's and Anne Arundel County Boards of Elections to conduct new primary elections for judicial offices in which all registered voters in the respective counties may participate. In addition, appellants seek an injunction barring the State Board of Elections from prohibiting unaffiliated voters from participating in future primary elections for judicial candidates. This Court issued a per curiam Order on the 2nd day of April, 2004 that (1) affirmed the denial by the Circuit Court for St. Mary's County of the appellants' request for a preliminary injunction and the invalidation of the March 2, 2004 primary elections and (2) reserved judgment on the issue of the declaratory judgment until an opinion later to be filed. 380 Md. 232, 844 A.2d 428 (2004). We now give the reasons for our Order and address the reserved issues.

## I.

The case involves a constitutional challenge to Maryland's procedure for electing circuit court judges. Under Maryland election law, a candidate for a circuit court judgeship may attain a spot on the general election ballot by winning the primary election of a "principal political party," *i.e.,* either the

Democratic or Republican Party. The two principal political parties in Maryland do not currently permit unaffiliated or nonparty members to vote in their primary elections, including elections for judicial candidates.[1]

Appellants are two registered voters of St. Mary's and Anne Arundel Counties, respectively, and are not affiliated with either of the principal political parties. Appellant Michael B. Suessmann is an unaffiliated registered voter in St. Mary's County. Appellant Gregory Care is an unaffiliated registered voter in Anne Arundel County. They wish to vote in the parties' primary elections, which nominate candidates for circuit court judgeships. Appellants seek declaratory and injunctive relief against the State Administrator of Elections and the individual members of the State Board of Elections, the Anne Arundel County Board of Elections, and the St. Mary's County Board of Elections (collectively "the State"). Appellants allege that their rights under the Fourteenth Amendment to the United States Constitution and the Maryland Declaration of Rights have been violated because State election law permits the exclusion of unaffiliated voters like themselves from participating in judicial primary elections, which have been designated by the State as "nonpartisan."

The five contested judicial primary elections this year (in Anne Arundel, Baltimore, Frederick, Harford, and St. Mary's Counties) were held on March 2, 2004. Appellant Suessmann filed his initial complaint on February 23, 2004 in the Circuit Court for St. Mary's County. He added, in the first amended complaint, Appellant Care on March 2, 2004. The complaint was filed as a putative class action. Pursuant to Maryland Code (2003, 2003 Cum.Supp.) § 12–203 of the Election Law Article,[2] appellants requested and were granted a special

---

1. Except where the context indicates otherwise, reference in this opinion to that which is "judicial," *e.g.,* judicial candidates or judicial elections, will almost always denote the Maryland circuit courts.

2. Unless otherwise indicated, all future statutory references in this opinion shall be to provisions in the Election Law Article of the Maryland Code (2003, 2003 Cum.Supp.).

three-judge panel to hear their claims.[3] The panel chair advised the parties that testimony was unnecessary, and no one objected.[4] Six days after a hearing before the three-judge panel on March 5, 2004 (in which virtually no factual findings were made), the Circuit Court issued its ruling denying all relief requested by appellants.[5] Pursuant to § 12–203, appellants noted a timely appeal to this Court,[6] requesting expedited review of the Circuit Court's decision in order that we might consider whether the judicial primary election procedures violated the State or Federal Constitutions.

## II.

Of all the judges in the Maryland judiciary, only those on the circuit court face the prospect of a contested election. While a vacancy on one of the circuit courts is initially and

3. Section 12–203 provides:
 "(a) *In general.*—A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that:
 (1) the proceeding shall be heard and decided without a jury and as expeditiously as the circumstances require;
 (2) on the request of a party or sua sponte, the chief administrative judge of the circuit court may assign the case to a three-judge panel of circuit court judges; and
 (3) an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court.
 (b) *Expedited appeal.*—The Court of Appeals shall give priority to hear and decide an appeal brought under subsection (a)(3) of this section as expeditiously as the circumstances require."

4. On several occasions during the hearing, without ruling on the matter, the panel inquired of the parties whether the respective political parties and the successful judicial candidate nominees should have been joined as necessary parties to this action. In light of the Circuit Court holding and our holding, we need not address this issue.

5. The Circuit Court ruled the § 12–202 claim failed because venue was improper, because appellants lacked standing under the statute, and because class certification was improper. But the panel also reached the merits, assuming *arguendo* that these procedural defects did not bar appellants' action. Our disposition of this case makes it unnecessary to address the issues of class certification and venue.

6. On March 12, 2004, plaintiffs noted appeals to both the Court of Special Appeals and to this Court. On March 17, 2004, plaintiffs filed a petition for writ of certiorari, which this Court granted.

temporarily filled by the governor, after his or her first full year from the date of the vacancy, a circuit court judge must win a general election to retain the judgeship for a term of fifteen years. Constitution of Maryland, Art. IV, §§ 3 and 5; *see Hillman v. Boone,* 190 Md. 606, 59 A.2d 506 (1948). Although judicial candidates appointed by the governor often run unopposed, they occasionally and increasingly have faced opposition from unappointed lawyers who wish to ascend to the bench. In these contested judicial elections, candidates for a circuit court judgeship, like candidates for almost every other elected office, must first obtain a place on the general election ballot and then a majority of the popular vote to be elected.[7]

The antecedent step toward becoming a popularly-elected circuit court judge, then, is earning a spot on the general election ballot. Maryland election law provides two routes for obtaining such a spot. The less common method is to be nominated by petition, which requires obtaining the signatures of a requisite number of registered voters, *see* § 5–703. The much more common method is to secure the nomination of a principal political party by winning the party's state primary election in the county where the court sits. *See* § 5–701. A principal political party—of which there are only two at one time, *see* § 1–101(kk), and which historically have consisted of the Republican and Democratic Parties—is required by statute to nominate its candidates for public office using a primary election system, *see* § 8–202, which in turn entitles its nominees to an automatic spot on the general election ballot. Overwhelmingly, winning a judicial primary is the preferred access route to the general election ballot, and the majority of circuit court judges obtain fifteen-year terms in this way.

██ Described as "an officially supervised party nominating procedure," *State Admin. Bd. v. Calvert,* 272 Md. 659, 676, 327 A.2d 290, 299 (1974), a political primary election is largely

---

7. It is possible but rare, pursuant to § 5–704 of the Election Law Article, to be elected as a write-in candidate, a potentiality not at issue in our opinion today.

regulated by Maryland election law—which, for example, sets the date of the primary and prohibits the use of write-in votes, §§ 8–201 and 8–205. Nevertheless, primary elections are not wholly creatures of the State Government, for the State must share the governance of such elections with the political party from which the primaries are born. *See California Democratic Party v. Jones,* 530 U.S. 567, 572–573, 120 S.Ct. 2402, 2407, 147 L.Ed.2d 502 (2000); *cf. Hennegan v. Geartner,* 186 Md. 551, 556, 47 A.2d 393, 395 (1946) (noting that "the Legislature has power to create and regulate primary elections, subject only to such prohibition as may be found in the State Constitution, and subject as to Congressional elections to any prohibitions in the Federal Constitution"). Thus, while State law governs specific facets of primary elections, those which are left untouched by the State remain within the authority of the principal political parties to determine.

■ One such facet, central to our inquiry today, is the qualifications of eligible primary voters. The most basic and intuitive qualification for a voter in a party primary is the requirement that the voter be a member of that party. While such a requirement is not expressly mandated by the State— permitting the political party to authorize voting rights to those who are unaffiliated with it, *cf. Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986)—historically, the two principal parties in Maryland have restricted voting rights in their respective primaries to their own registered members. *See Calvert,* 272 Md. at 677– 78, 327 A.2d at 300 (quoting *Hennegan,* 186 Md. at 558, 47 A.2d at 396).

■ The Maryland Code is silent as to the question of who may vote in a primary election, thereby leaving that decision to the principal political parties. Neither the Republican nor Democratic Party in Maryland permits unaffiliated voters to participate in primary elections. The restriction on the primary vote to party members applies to all primary elections—including primary elections for circuit court judgeships. In this respect judicial primary elections are identical

to primary elections for other public office. In three other respects, however, judicial elections differ, in accordance with State election law: First, judicial candidates in a principal party's primary election need not be affiliated with the principal party. § 5–203(b). For example, a judicial candidate officially registered as a member of the Republican Party may be a candidate in the Democratic Party's primary election. Second, judicial candidates may file as a candidate in the primary elections of *both* principal political parties at the same time. §§ 5–203(b) and 5–706. As a result, judicial candidates often "cross-file" in the two primary elections and could lose in one party's primary election yet attain access to the general election ballot by winning the other party's primary election. Third, unlike other nominees on the general election ballot, judicial candidates are not designated on the general election ballot as the nominee of any political party, regardless of which primary the candidate won. § 9–210(g)(3). As we shall see, appellants consider these distinctions crucial to the issue before the Court today.

For the last sixty years, the requirement that primary voters be members of the political party in order to vote in the primary has been unchallenged—until today. Appellants, apparently aggrieved by these primary election procedures, claim that the party-imposed and State-endorsed exclusion of unaffiliated voters like themselves from the primary elections for judicial candidates violates both their State and Federal constitutional rights.

In their first amended complaint, appellants asserted several causes of action which we will reformulate for purposes of clarity into the major three: a cause of action created by State election law for the purpose of remedying unlawful election outcomes; a cause of action under the State Constitution; and a cause of action under federal law and the Federal Constitution.

■ First, appellants assert a specialized claim under State election law. Pursuant to § 12–202 of the Election Law Article, under certain exigent circumstances, a registered

voter may seek judicial relief from an unlawful "act or omission relating to an election." § 12–202(a). Such relief may include the voidance of an already-held election as well as a judicially instituted new election. *See* § 12–204. Appellants requested that the Circuit Court void the March 2, 2004 judicial primary elections and enjoin the State from issuing certificates of nomination to the winners (which would have the principal effect of preventing this year's judicial primary winners from being officially designated the nominees of the principal parties).

Second, appellants allege violations of Articles 7 [8] and 24 [9] of the Maryland Declaration of Rights, which guarantee a Maryland citizen's right to vote and equal protection under the laws. For these alleged violations by the State election officials, appellants requested a declaratory judgment and permanent injunctive relief from the practice of excluding unaffiliated voters from judicial primary elections.

Finally, appellants'· federal claim arises under 42 U.S.C. § 1983, which creates an explicit cause of action for violations of federal law (including the Federal Constitution) under color of state law. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Serv. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Appellants allege that the State, under color of state law, denied them their fundamental right to vote and equal protection under the laws guaranteed to them by the Fourteenth Amendment.

---

**8.** Article 7 of the Maryland Declaration of Rights provides as follows: "That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

**9.** Article 24 of the Maryland Declaration of Rights provides as follows: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

## III.

We address first the issues relating to appellants' first claim under § 12–202 and explain our reasons for denying all relief in this Court's Order dated April 2, 2004.

The laws governing judicial challenges to elections took on their modern shape almost two decades ago when the Maryland legislature revisited judicial review of election results in response to our opinion in *Duffy v. Conaway*, 295 Md. 242, 455 A.2d 955 (1983). In *Duffy*, we held that certain provisions of the Maryland election laws bestowed on the courts a "nonjudicial" function in violation of Article 8 (Separation of Powers) of the Maryland Declaration of Rights. *Id.* at 262–263, 455 A.2d at 965; *see, e.g.*, *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 334 A.2d 514 (1975). The Legislature responded by greatly simplifying the process for contesting elections in court and permitting the courts to render final decisions on election disputes. These changes were an attempt to correct and unify the laws relating to election disputes, some of which had previously allowed the courts to render advisory opinions. *See Duffy*, 295 Md. at 260, 455 A.2d at 964.

The resulting changes to the Maryland election laws, *see* 1985 Maryland Laws ch. 755, § 1, at 3559–66, fashioned a particular cause of action for contesting election outcomes, which have been retained substantively even as the law was recodified and revised as Title 12, Subtitle 2, of the Election Law Article. *See generally* 1997 Report of the Commission to Revise the Election Code (in bill file for Senate Bill 118, crossfiled as House Bill 127 (1998) (available at Maryland State Legislative Services)). This subtitle is the general default for judicial review of contested elections. Section 12–201 of the subtitle is a general statement about the scope of the subtitle; § 12–202 lays out the cause of action; § 12–203 describes the special judicial procedures for suits brought under the subtitle; and § 12–204 describes the types of remedies a court may grant as relief. Our concerns are with the nature of the type of claim that may be brought under the subtitle, particularly

§ 12–202 which provides the elements for such a claim, and with whether appellants' action fits within the subtitle.

### A.

We turn to the question of appellants' standing to raise a § 12–202 challenge. Our focus in deciding whether a litigant has standing to sue is "on the party seeking to get his complaint before the court and not on the issues he wishes to have adjudicated," *Pollokoff v. Maryland Nat. Bank*, 288 Md. 485, 497, 418 A.2d 1201, 1208 (1980) (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968)). Although literally we are focusing here on who the litigants are and not what issues are being litigated, in reality, the standing question in the case *sub judice* is about the statutory interpretation of § 12–202 and whether the statute contemplates litigants like appellants availing themselves of its remedies, *i.e.*, statutory standing. *See, e.g., Mid–Atlantic v. Public Service*, 361 Md. 196, 760 A.2d 1087 (2000) (holding that utility trade association had statutory standing to seek judicial review under Public Utilities Article of the Maryland Code); *cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 96–97, 118 S.Ct. 1003, 1013, 140 L.Ed.2d 210 (1998) (distinguishing between statutory standing and Article III standing in the federal courts). In addition to limiting the types of issues the subtitle would cover, *see* § 12–201, the subtitle also limits to "registered voters" the types of litigants who may seek to get their complaint before the court. § 12–202(a). For instance, a fifteen year-old would have no statutory standing to assert a claim under § 12–202 because a minor cannot be a registered voter.

In the case *sub judice*, the Circuit Court found that appellants did not have statutory standing to assert a cause of action under § 12–202 because they were not registered voters. The court based its decision on the fact that appellants were not registered voters *of the political party in whose primary they wanted to vote*. The court held, as a matter of statutory interpretation, that the Legislature did not intend

litigants in appellants' situation to invoke the procedure provided for in § 12–203, *i.e.,* a three-judge panel of circuit judges with expedited review in this Court.

 Section 1–101(mm) defines a "registered voter" for purposes of the Election Law Article by stating that the term "does not include an individual whose name is on a list of inactive voters." *See Green Party v. Board of Elections,* 377 Md. 127, 832 A.2d 214 (2003). Appellants are not included on a list of inactive voters, and the record shows that they *are* lawfully registered voters, albeit as unaffiliated with either principal party. Because § 12–202(a) does not distinguish among voters registered by party or, for that matter, by no party, any registered voter has standing to sue under the statute, and one need not be a registered voter in a particular political party to be considered a registered voter for purposes of § 1–101(mm) or, therefore, § 12–202. Because §§ 1–101(mm) and 12–202(a) are facially clear and unambiguous, we apply the plain language of the statutes. *See Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003). The Circuit Court erred in holding that appellants were not registered voters under § 12–202 by virtue of their registering as independents or unaffiliated. We hold that appellants have statutory standing to assert the procedure laid out in § 12–203, pursuant to the statutory standing explicitly granted in § 12–202(a) to registered voters.

### B.

Even though we find that appellants have standing, it remains to be determined whether they have satisfied the elements of the cause of action laid out in § 12–202.

 Section 12–202(a) provides as follows:

"(a) *In general.*—If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:

(1) is inconsistent with this article or other law applicable to the elections process; and

(2) may change or has changed the outcome of the election."

Section 12–202(a) sets forth four elements to a judicial challenge to an election outcome. The first element is the absence of any other "timely and adequate remedy ... provided by [the Election Law] article." *Id.* The second element is an "act or omission relating to an election." *Id.* The third element requires a showing that the act or omission be unlawful according to "law applicable to the elections process." § 12–202(a)(1). And finally, the fourth element requires a showing that the act or omission "may change or has changed the outcome" of the election being challenged. § 12–202(a)(2). If appellants did not plead or cannot prove any of these elements, their complaint cannot be granted relief under § 12–202.

Assuming *arguendo* that appellants can satisfy elements one, two and three, they fail on element four. Appellants cannot show that there is a substantial probability that the outcome of the election would have been changed.

With regard to the fourth element, § 12–202(a)(2), appellants argue:

"The sole remaining question under § 12–202 is whether the challenged acts may have changed the outcome of the election.... Because it may not make sense to give unaffiliated voters the option to chose which party's primary they will vote in, it makes sense to analyze the likelihood of altering the outcome if the election were conducted [in a nonpartisan primary].... If the Democratic and Republican votes in the Anne Arundel County primary are aggregated, the margin of difference between the winning and losing candidate ... is 1,201 votes (12,779–11,598). This is approximately three percent of the 42,994 unaffiliated voters in the county, thereby requiring only a relatively small turnout to alter the outcome of the election."

Appellants' brief, at 28–29. The State disagrees with the appellants' interpretation of § 12–202(a)(2) and contends that § 12–202(a)(2) cannot be read to permit litigants to make out a claim based upon mere speculation as to how a voter would have voted. Because appellants presented *no* evidence regarding the likelihood of a changed election outcome, the State contends they failed to establish element four under § 12–202. We agree.

The language of the statute requires an illegal act or omission that "may change or has changed the outcome of the election." § 12–202(a)(2). The meaning of an act that *"has* changed" the outcome of an election is clear: but for the illegal act or omission, the election results would have been different.

But the meaning of "may change" is a different matter. As we observed when interpreting the statutory predecessor, Maryland Code (1957, 1986 Repl.Vol.) Art. 33, § 19—which essentially is identical—to this subtitle, "[T]he unqualified term 'might' [or 'may'], however, ranges over a spectrum from the barest possibility to high probabilities which, depending on the context, could be just short of an absolute." *Snyder v. Glusing*, 308 Md. 411, 425, 520 A.2d 349, 357 (1987) (*"Snyder II "*). In other words, if alleging that an act *has changed* an election outcome means alleging a hundred percent probability that but for the act, the outcome would have been different, what probability of a changed election outcome must be alleged in order to satisfy the requirement that an act *may have changed* an election outcome? One percent? Ten percent? Fifty-one percent? Ninety percent? In pragmatic terms, this is the question now before us.

Even appellants acknowledge that § 12–202(a)(2) contemplates more than mere theoretical possibility, more than a one percent probability, of a changed outcome. That is why they voluntarily withdrew their § 12–202 claim with respect to one of the judicial elections they were challenging.[10] Because of

---

**10.** Appellants' original complaint alleged a cause of action under § 12–202 for both St. Mary's and Anne Arundel Counties. After the lopsided

the lopsided results of that judicial primary election, appellants admitted that they could not "credibly" claim that allowing the unaffiliated voters to vote might have changed the outcome of the election. Appellants' brief, at 5. They reasoned that the incumbent judges in those elections won by over 4,000 votes with a turnout of 34% of registered, party-affiliated voters. They then calculated that to change the outcome of those races, 62% of unaffiliated registered voters would be required to vote, with nearly 100% of them voting for a losing candidate. Because those circumstances seemed unlikely, appellants withdrew their challenge to that judicial election in St. Mary's County.

To be sure, appellants' voluntary withdrawal of a claim that they unilaterally considered meritless says nothing about the actual meaning of the phrase "may have changed." But it does indicate the correct intuition that § 12–202(a)(2)'s demand has real bite. "May change" does *not* mean the barest possibility, a 1% probability of a change, or even, as appellants assert, a "reasonable likelihood of affecting the outcome." *See* Appellants' brief, at 5. "Reasonable likelihood" is a test pulled out of thin air by appellants and has no basis in our past cases dealing with judicial challenges to election outcomes. Nor does it answer the key question of *how* probable a changed outcome must be to satisfy § 12–202(a)(2).

Our first encounter with this type of issue involved a referendum election that created a sanitary district in Allegany County. *Wilkinson v. McGill,* 192 Md. 387, 64 A.2d 266 (1949). The act creating the district passed by a margin of only 16 votes. Twenty-three of the counted votes were illegal. If the illegal votes were discounted and 16 or more had been in favor of the act, the election would have gone the other way. Even in the face of a margin as small as 16, we held that the burden upon the complainants desiring to nullify the election results could not be satisfied by arguing that there exists a possibility that the votes were so cast:

election results for St. Mary's County, on March 3, 2004, they voluntarily withdrew their § 12–202 claim for that judicial primary election.

"They cannot thrust that burden upon the Court by arguing that there is a probability that such votes were cast for the side having the majority. They must prove, or at least attempt to prove, *how* the illegal voters voted. If direct proof cannot be obtained from the illegal voters themselves, other evidence of a circumstantial nature may be offered. In any event, there must be an effort to produce this proof."

*Id.*, at 402, 64 A.2d at 274 (emphasis added). The judicial policy enunciated in *Wilkinson* is that a court will not overturn an election already held without *some* hard evidence that the votes would have been cast in a particular manner. Speculating that the votes would have been so cast, even if it was as plausible as supposing that 16 of 23 votes went one way instead of another, will not survive a summary judgment motion. Surely the burden can be no less for appellants, who have speculated on the manner of voting of, not 23, but thousands of votes.

We relied on *Wilkinson* to explain our rejection of another act or omission that "may have changed" the outcome of an election in *McNulty v. Board of Elections*, 245 Md. 1, 224 A.2d 844 (1966). In a primary election, 136 votes were counted as voting for no one because they were cast for the non-existent candidate on the "bottom line" of the ballot. McNulty, the primary candidate bringing the judicial challenge, had campaigned under a slogan requesting his supporters vote on the "bottom line" because that was where his name was supposed to be on the election ballot. Due to an *illegal* error on the part of election officials, McNulty's name was placed on the second-to-bottom line. He argued, and the Board of Elections unanimously agreed, that the *probable* intention of the 136 voters was to vote for McNulty, in which case he would have won the election. *Id.*, at 7, 224 A.2d at 847. This Court, though, again rejected a reliance on probability to overturn an election outcome. In contrast to *Wilkinson* in which there was no evidence of the voters' intent, in *McNulty*, the record showed that it was "probably" the intention of the bottom-line voters to vote for McNulty who had campaigned under that

slogan. But even this, we held, was insufficient to overturn an election and institute new ones, as appellants now ask us to do. *McNulty* teaches that even a probability of 51%, of "more likely than not" or "reasonable likelihood," will not suffice to overturn an election result and institute new elections.

Most recently, we once again elaborated on the required level of probability in *Pelagatti v. Board of Elections,* 343 Md. 425, 682 A.2d 237 (1996). Judge Eldridge, writing for the Court, held that "the party challenging the election results has the burden of proving that the illegality *changed the outcome of the election.*" *Id.* at 441, 682 A.2d at 245 (emphasis added). Significantly, *Pelagatti* rejected probability analysis altogether and simply foreclosed it as a basis for overturning election results. *Id.* (stating that the "courts will not guess or speculate or 'resort to probability' as to which candidate or which side of an issue the invalid ballots favored"). Instead, a challenger basing his claim on improperly counted ballots would need to show that the invalid ballots *actually changed* the outcome of the election, arguably requiring a certainty that the outcome was changed due to the illegality. Although *Pelagatti,* like *Wilkinson* and *McNulty,* was not an explicit interpretation of § 12–202, along with *Wilkinson* and *McNulty, Pelagatti* is instructive in pointing us to a proper interpretation of the requisite probability anticipated by § 12–202(a)(2)'s language "may change." By evincing the entrenched common law policy against overturning elections in Maryland, a presumption from which this Court has never wavered and which the Legislature has never given any indication of disapproval, those cases portend a high bar for satisfaction of § 12–202(a)(2).

The high bar enunciated by *Wilkinson, McNulty,* and *Pelagatti* is applied in *Snyder I* and *Snyder II* to § 12–202. These two cases are controlling to the issue before us, for they interpret the statutory predecessor to § 12–202, which is substantively identical to the current statute for purposes of this discussion.[11] In *Snyder v. Glusing,* 307 Md. 548, 515 A.2d

---

11. In 1998, §§ 19–1 through 19–5 of Maryland Code (1957, 1986 Repl.Vol.) Art. 33 were repealed and replaced by Title 12, Subtitle 2 of

767 (1986) (*Snyder I* ), the challenger brought suit under the statutory predecessor to § 12–202, and we held that the statute did not require that a challenger prove that the election had *in fact* been changed by the illegality. *Id.* at 550, 515 A.2d at 767–68. In *Snyder II*, however, after the lower court on remand found that the plaintiffs had not demonstrated a sufficient probability that the outcome would have been different, we considered the precise question before us today, the degree of probability necessary for a court to nullify an election:

"Section 19–5(1) [Md. Code (1957, 1986 Repl.Vol.) Art. 33 (superseded) ] requires a petitioner in a contested election case to demonstrate only that the violation complained of 'might' have changed the outcome. Obviously the Legislature would have created an impossible burden were the petitioner required to show that the violation complained of changed the outcome of the election. The unqualified term, 'might,' however, ranges over a spectrum from the barest possibility to high probabilities which, depending on the

the current Election Law Article. 1998 Md. Laws ch. 585, § 2. Sections 19–1 to 19–5 provided, in relevant part, as follows:

" § **19–1. Applicability.**
This subtitle applies to any issue arising in any election conduct pursuant to this article.

§ **19–2. Judicial Challenges.**
If no other timely and adequate remedy is provided by this article, and by filing a petition in accordance with the provisions of § 19–3 of this subtitle, any registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:

(1) Is inconsistent with this article or other law applicable to the elections process; and

(2) May change or have changed the outcome of the election.

§ **19–5. Judgment.**
Upon a finding, based upon clear and convincing evidence, that the act or omission involved materially affected the rights of interested parties or the purity of the elections process and:

(1) Might have changed the outcome of an election already held, the court shall:

(i) Declare Null And Void The Election For The Office, Offices, Question, Or Questions Involved And Order That The Election Be Held Again On A Date Set By The Court; Or

(ii) Order any other relief that will provide an adequate remedy."

context, could be just short of an absolute. Section 19–5 confines this range by requiring that the finding be 'based upon clear and convincing evidence.' ... Consequently, a petitioner proves that an election law violation 'might have changed the outcome' when the facts demonstrate a *substantial probability* that the outcome might have been changed."

308 Md. at 425, 520 A.2d at 357 (emphasis added).

 This reasoning and analysis remain both sound and applicable to the statute's almost identical descendent: To sustain a judicial challenge pursuant to § 12–202, the litigant must prove, by clear and convincing evidence, a *substantial probability* that the outcome would have been different but for the illegality. This is the level of probability anticipated by § 12–202(a)(2)'s requirement that the judicial challenge be based on grounds that an illegal action "may change or has changed the outcome of the election." A substantial probability, while less than a hundred percent, is significantly more than "more likely than not" and must be proven by clear and convincing evidence. *See* § 12–204(d) (stating that the standard of proof is clear and convincing evidence).

Appellants have not met this burden. Even were we to assume that all of appellants' allegations are true, that "only a relatively small turnout [of unaffiliated voters would be necessary] to alter the outcome of the [March 2 judicial primary] election," appellants have not alleged a single fact that would point to *how* those unaffiliated voters would have voted or even that they would have voted for a different candidate other than the winner. Nor have they alleged any facts pointing to a turnout of unaffiliated voters sufficient to alter the judicial elections, relying instead on the conclusory mathematical observation that a "relatively small turnout" would be required. The appellants have not presented anything beyond mere speculation as to how unaffiliated voters would have voted or how the election would have been changed.[12]

---

12. Appellants submitted a single affidavit from Mr. Gregory Care that stated he was denied the right to vote in the judicial primary election

Appellants' facile understanding of the complexities of election law are insufficient to draw a contention within the contours of § 12–202. Indeed, appellants rely only on pure speculation that an election *might* have been changed, without even alleging facts sufficient to satisfy their own test, that there was a reasonable likelihood of a changed outcome, much less a substantial probability.

In sum, appellants are incorrect in their understanding of § 12–202(a)(2), and their complaint consequently is defective. A complaint that falls under § 12–202, thereby entitling the party to a three-judge panel of circuit court judges, must allege more than the act or omission *could* have changed the outcome of the election. A party must, instead, allege that there exists a *substantial probability* that the outcome of the election *would* have been changed. For the reasons stated above, the complaint does not satisfy § 12–202(a)(2). Because appellants did not satisfy this essential element, the complaint should have been dismissed.

## IV.

### A.

We turn now to appellants' claims for relief under the Maryland Constitution and 42 U.S.C. § 1983. The question is whether Maryland may, consistent with the Fourteenth Amendment to the Federal Constitution and Articles 7 and 24 of the Maryland Declaration of Rights, restrict the right to vote in a judicial primary election to members of the political party holding the election.

Appellants argue that restricting the primary vote for judicial candidates to registered party members infringes impermissibly on the voting rights of a certain class of voters— specifically, those voters who choose not to affiliate with a principal political party—because the State has designated judicial elections as "nonpartisan." They reason that if the

---

for Anne Arundel County because he was unaffiliated with either party. It stated he "wish[ed] to vote to retain the sitting judges."

State provided for a nonpartisan judicial primary election, the State was constitutionally bound to permit all registered voters, including nonpartisans, to vote in such a primary. They contend that as a hindrance to the fundamental right to vote, the ban against unaffiliated voters must be subject to strict scrutiny equal protection analysis and struck down.

Importantly, appellants concede that had the State chosen a *partisan* format for judicial primary elections, appellants would have no constitutional claim for redress and the parties would be free to permit only registered members to vote in the primaries. This is more than a mere concession of law, which does not bind this Court, *see Spencer v. Board of Pharmacy*, 380 Md. 515, 523, 846 A.2d 341, 345–46 (2004), but rather a recognition of the indisputable First Amendment rights the political parties themselves retain. *See, e.g., California Democratic Party v. Jones*, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (holding that California's "blanket primary," requiring political parties to open their primaries to voters wholly unaffiliated with the party, violated the First Amendment); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (holding that Connecticut's closed primary statute, requiring political parties to restrict primary voting rights to those affiliated with it, violated the First Amendment); *Nader v. Schaffer*, 417 F.Supp. 837 (D.Conn.), *summarily aff'd*, 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976) (holding that plaintiffs cannot assert a constitutional right to vote in a particular party's primary when they refuse to register as members of that primary).

Before reaching the constitutional issue, we will consider the basic assumption underpinning appellants' argument, *i.e.*, that Maryland's judicial primary elections are "nonpartisan." The Circuit Court, disagreeing with appellants, found Maryland's judicial elections to be "in essence a partisan process, not nonpartisan as [appellants] so desire." Because appellants' case depends upon judicial elections being nonpartisan, they vigorously dispute this finding as clear error. If judicial

primary elections are partisan, then appellants' argument collapses on its own terms, for they concede that, in a partisan primary, political parties are free to restrict their voting rolls to registered members, as political parties do in their primary elections for other offices, such as Governor. Appellants believe, however, that elections for judicial office fundamentally are different from elections for Governor. We must decide whether this is so, whether judicial elections are so distinguishable from other, obviously partisan elections that they are properly labeled nonpartisan.

■ The applicable standard of review as to whether an election is nonpartisan is unclear, but in any case, we need not decide whether the issue is legal, factual, or a mixed question of law and fact because, under any standard of review, the Circuit Court was correct in its determination.

The Election Law Article does not define the word "nonpartisan," nor is it defined elsewhere in the Maryland Code or Code of Maryland Regulations. The term "nonpartisan" appears in only three provisions of the Election Law Article, but not at all in the contexts referred to us by appellants as evidence of the nonpartisan nature of judicial elections. Thus, appellants' best evidence that the State has established nonpartisan judicial elections—the fact that the State's laws provide for them—does not exist.

Instead, the provisions that do mention nonpartisanship strongly suggest the opposite view. Title 8, Subtitle 8 of the Election Law Article, where the term "nonpartisan" first appears, covers elections for members of the boards of education. Section 8–802, entitled "Nonpartisan Elections," requires that members of the boards of education "be elected on a nonpartisan basis." § 8–802(a)(1)(i). The statute does not elaborate upon the meaning of "nonpartisan basis," but clearly it applies to the election of board members. The nomination of candidates is provided for in the next provision, § 8–802(a)(1)(ii), which reads as follows:

> "In a primary election to nominate board of education candidates, any registered voter of the county, regardless of

party affiliation or lack of party affiliation, is eligible to vote in those contests for nomination."

It seems obvious that, just as § 8–802(a)(1)(i)'s purpose is to mandate a nonpartisan general election, § 8–802(a)(1)(ii)'s purpose is to mandate a nonpartisan primary election. Thus, § 8–802(a)(1)(ii) provides us with a useful statutory depiction of what is meant by a nonpartisan primary. The inescapable conclusion is that when the State truly establishes a nonpartisan primary, the primary is characterized by the fact that *unaffiliated voters are eligible to vote in it.* Indeed, the statute implies that a nonpartisan primary is defined by the ability of unaffiliated voters to vote in the primary. If this be so, then the political primaries nominating circuit court judges cannot, by definition, be nonpartisan since unaffiliated voters are ineligible to vote in them.

Furthermore, § 8–802(a)(2)(i)–(v) [13] states that candidates for the boards of education "shall" not be designated affiliated to any party with respect to their filing of certificates for candidacy, certification to the ballot, appearance on the ballot, being voted on, nomination, and election. While judicial candidates, like board of education candidates, do not need to be affiliated with the party, *see* § 5–203(b), and do not have party designations on the general election ballot, *see* § 9–210(g)(3), there is no separate affirmative mandate for judicial candidates to refrain from party affiliation in all aspects of the election, as is made evident by § 8–802(a)(2) for board of education candidates. Also, in contrast to vacancies created by board member candidates after they have won the primary but before the general election, vacancies on the ballot occurring after judicial candidates have won the primary election

---

13. Section 8–802(a)(2) provides as follows:

"Candidates for election to boards of education shall, without party designation or regard to party affiliation:
 (i) file certificates of candidacy;
 (ii) be certified to the ballot;
 (iii) appear on the ballot;
 (iv) be voted on; and
 (v) be nominated and elected."

are filled by the central committee [14] of the same political party of the individual vacating the nomination. *Compare* § 8–805 *with* § 5–1004. In sum, the Election Law Article contemplates key features distinguishing nonpartisan board of education elections from the elections for judicial candidates, signaling, at the very least, that its understanding of nonpartisan does not comport with appellants' view.

■ The second reference to "nonpartisan" in the Election Law Article provides yet more evidence, which is also supported in the record of this case, that judicial primaries are not nonpartisan affairs. Section 9–206(a)(5), delineating the format for primary election ballots, requires that "the name of the political party *or the words 'nonpartisan ballot', as applicable* " (emphasis added), be printed at the top of every primary election ballot. The ballots used in the Republican and Democratic primaries utilize this format and contain only the name of the appropriate political party at the top, whereas the ballots used in the boards of education primary utilize a ballot with the designation "Nonpartisan Ballot" at the top. The candidates for circuit court are listed only on the Republican or Democratic primary ballots, not the nonpartisan one. There is no evidence of a practice separately confining nominees for the circuit court to a so-called nonpartisan ballot as mandated by § 9–206(a)(5); nor is there any evidence that the State Board of Elections has ever demanded that the political parties use a nonpartisan ballot for their circuit court nominees. Thus, the State Board of Elections maintains a continuing practice and interpretation of § 9–206(a)(5) that views judicial primaries as partisan affairs, which is due a level of deference. *See Falik v. Prince George's Hosp.*, 322 Md. 409, 416, 588 A.2d 324, 327 (1991) (noting that the consistent construction by an administrative agency responsible for administering a statute is entitled to considerable weight).

---

**14.** The Election Law Article requires that each political party have a State and County Central Committee. *See* §§ 4–201 and 4–202.

The third statutory reference to "nonpartisan" in the Election Law Article confirms the already substantial evidence that the State has not provided for nonpartisan judicial elections. Section 9–210 sets forth a specific arrangement for the ballots of the general election, mandating that the various public or party offices be listed on the ballot in a statutorily predetermined order, beginning with the office of President of the United States, § 9–210(a)(1)(i). The sixth office to be listed on the general election ballot are judicial offices, including the circuit courts. § 9–210(a)(6). The ninth office to be listed on the general election ballot are "offices filled by nonpartisan election." § 9–210(a)(9). The statute does not equate judicial elections with those that are nonpartisan; indeed, it does the exact opposite by excluding judicial offices from the category of nonpartisan.

As further recognition that the election process is partisan, the Maryland Code of Judicial Conduct and the Code of Conduct for Judicial Appointees permits judges and lawyers who are candidates to engage in "partisan political activity," in contrast to a broad prohibition on sitting judges from engaging in political activities. *See* Md. Rule 16–813, Canon 5B; Rule 16–814, Canon 5B. Finally, when no one files as a candidate for an available circuit court position in a particular party primary, the party's county central committee may fill the vacancy. *See* § 5–901(d).

Appellants identify three characteristics that they believe establish judicial elections as nonpartisan: First, judicial candidates are not required to be affiliated with a particular political party in order to be a candidate in its primary,[15]

---

15. Appellants also assert that "[u]nique among all candidates for public office, Maryland *requires* political parties to permit candidates for judicial office to run in the primary even if they are not members of the party. [§ 5–203]." Appellants' brief, at 7 (emphasis added). While we express no opinion as to whether this assertion is correct, we note that appellants have cited, as direct support, authority that does not stand for their proposition. A careful reading of § 5–203(b)(1) reveals that it *exempts* judicial candidates from the requirement that they be registered members of the party nominating them in its primary; it does not

§ 5–203(b); second, judicial candidates may "cross-file" as candidates into the primary elections of *both* principal political parties at the same time, §§ 5–203(b) and 5–706; and third, judicial candidates are not designated as the nominee of any political party on the general election ballot, regardless of which primary the candidate won, § 9–210(g)(3). Appellants rely on *Smith v. Higinbothom*, 187 Md. 115, 133–34, 48 A.2d 754, 763 (1946), as support for their position.

We find these arguments unpersuasive. To be sure, the statutory provisions cited by appellants reflect the truth of the statement this Court made in *Smith v. Higinbothom* that "the public policy of the State is to keep partisanship out of the election of judges *as far as possible* . . . " *Id.* at 133, 48 A.2d at 763 (emphasis added). But that does not transform Maryland's meticulously crafted judicial elections process into a nonpartisan one. The State is not constitutionally barred from evincing a policy of nonpartisanship in judicial elections while nevertheless keeping the election process itself an inherently partisan affair; nor is it barred from relying on the long-established infrastructure of a political party primary to accommodate the election of candidates it desires to be selected on bases apart from partisan politics. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 795, 122 S.Ct. 2528, 2545–46, 153 L.Ed.2d 694 (2002) (Kennedy, J., concurring) (noting that "States are free to choose [open elections for judicial offices] rather than . . . appointment and confirmation"); *California Democratic Party*, 530 U.S. at 572, 120 S.Ct. at 2406–07 (recognizing that States have a major role to play in structuring and monitoring elections, including primary elections); *Gregory v. Ashcroft*, 501 U.S. 452, 461–462, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991) (stating that the Framers of the Constitution intended the States to keep for themselves the power to regulate elections); *Hennegan*, 186 Md. at 556, 47 A.2d at 395 (stating that the State is authorized to regulate and legislate primary elections); *Anderson v. Baker*, 23 Md.

---

*require* political parties to accept judicial candidates who are unaffiliated with the party in their primaries.

531, 619 (1865) (noting that the right to regulate the elective franchise is an absolute and unqualified right of the State). Indeed, there is historical evidence that this is precisely what was intended.[16] Finally, when the State wishes to establish a nonpartisan election, it has proven that it knows how by its creation of the explicitly nonpartisan school board elections.

---

**16.** Justice O'Connor has recently recounted some of the history of state judicial elections:

"... 39 States currently employ some form of judicial elections for their appellate courts, general jurisdiction trial courts, or both. Judicial elections were not always so prevalent. The first 29 States of the Union adopted methods for selecting judges that did not involve popular elections. As the Court explains, however, beginning with Georgia in 1812, States began adopting systems for judicial elections. From the 1830's until the 1850's, as part of the Jacksonian movement toward greater popular control of public office, this trend accelerated, and by the Civil War, 22 of the 34 States elected their judges. By the beginning of the 20th century, however, elected judiciaries increasingly came to be viewed as incompetent and corrupt, and criticism of partisan judicial elections mounted. In 1906, Roscoe Pound gave a speech to the American Bar Association in which he claimed that 'compelling judges to become politicians, in many jurisdictions has almost destroyed the traditional respect for the bench.'

"In response to such concerns, some States adopted a modified system of judicial selection that became known as the Missouri Plan (because Missouri was the first State to adopt it for most of its judicial posts). Under the Missouri Plan, judges are appointed by a high elected official, generally from a list of nominees put together by a nonpartisan nominating commission, and then subsequently stand for unopposed retention elections in which voters are asked whether the judges should be recalled. If a judge is recalled, the vacancy is filled through a new nomination and appointment. This system obviously reduces threats to judicial impartiality, even if it does not eliminate all popular pressure on judges. The Missouri Plan is currently used to fill at least some judicial offices in 15 States. "Thirty-one States, however, still use popular elections to select some or all of their appellate and/or general jurisdiction trial court judges, who thereafter run for reelection periodically. Of these, slightly more than half use nonpartisan elections, and the rest use partisan elections."

*Republican Party of Minnesota v. White*, 536 U.S. at 790–792, 122 S.Ct. at 2543–44 (2002) (O'Connor, J., concurring) (citations omitted). Although Maryland's plan for the election of circuit court judges does not conform to the so-called "Missouri Plan," it is clear that Maryland, like many states, has sought a compromise on the election of circuit court judges. The appellate judges in Maryland are elected in accordance with the Missouri Plan.

It has not done so in the context of judicial elections for the circuit courts, which remain, despite appellants assertions to the contrary, partisan affairs.

### B.

Appellants assert that the combined effect of the statutory provisions and stated policies of the State, which seek to keep partisanship out of judicial elections, works an unconstitutional burden on appellants' right to vote, regardless of whether the State has established a partisan or nonpartisan format for judicial elections. From this perspective, it is less important what the State intended to do when it established the judicial elections than the manner in which the election system functions vis-a-vis unaffiliated voters.

Appellants contend that Maryland's procedure for electing judges functions to impinge upon a fundamental constitutional right and should be subjected to judicial "strict scrutiny." When a challenge to legislation is based on equal protection grounds, the Fourteenth Amendment "requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Here, appellants claim that their fundamental right to vote in the primary elections of a political party to which they do not belong is impermissibly being infringed upon by the Maryland election laws. Thus, they reason, Maryland's election laws, to the extent they do not allow unaffiliated voters to vote in judicial primary elections, must be subjected to strict scrutiny and struck down.

The State responds that strict scrutiny analysis does not apply because Supreme Court precedent makes clear that the mere fact a law imposes a burden on the right to vote does not mean the law must be subjected to strict scrutiny. Instead, a more flexible standard applies in which the reviewing court weighs the character and magnitude of the asserted injury

against the fundamental rights protected by the Constitution. As explained by the Supreme Court:

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'

"Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently . . . .

"Instead, . . . a more flexible standard applies. A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' "

*Burdick v. Takushi,* 504 U.S. 428, 433–434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (citations omitted).

While we think it clear that the State's understanding of the law in this area is correct and appellants' is erroneous, the outcome does not turn upon whether strict scrutiny or the more flexible standard stated in *Burdick* applies. Instead, the key inquiry is *whether appellants' have asserted a fundamental right in the first place.* Both strict scrutiny and the standard stated in *Burdick* apply only when the State has burdened a fundamental right or interest protected by the Constitution. As the Supreme Court has noted, "[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation *burdens First and Fourteenth Amendment rights."* *Id.* at 434, 112 S.Ct. at 2063 (emphasis added).

Here, appellants assert the fundamental "right to vote" is burdened. But that is not, precisely speaking, an accurate formulation of appellants' asserted right. They do not claim the State has deprived them of the right to vote generally, but rather that the State has deprived them of the right to vote *in the primary elections of a party to which they do not belong.* They claim this interest is a fundamental one, in the constitutional sense of the word.

The Supreme Court has explicitly rejected the notion that there is a fundamental right to vote in the nominating primary of a party to which one does not belong: "As for the associational 'interest' in selecting a candidate of a group to which one does not belong, that falls far short of a constitutional right, if indeed it can even be fairly characterized as an interest." *California Democratic Party,* 530 U.S. at 573, 120 S.Ct. at 2408 n. 5. "The voter who feels himself disenfranchised [by the restriction of primary voting rights to registered party members] should simply join the party. That may put him to a hard choice, but it is not a state-imposed restriction upon *his* freedom of association." *Id.* at 584, 120 S.Ct. at 2413. Indeed, long before the Supreme Court's decision in *California Democratic Party,* this Court also re-

jected the notion that there exists a right to vote in the primary elections of a party to which one does not belong: "There is no fundamental right in any voter to participate in the primaries or conventions of parties other than the one to which he belongs. Neither Article 7 of the Declaration of Rights nor Section 1 of Article 1 of the Constitution have any such implication." *Hennegan*, 186 Md. at 559, 47 A.2d at 396.

The thrust of appellants' argument is that the exclusion of unaffiliated voters from partisan party primaries *is* an impingement on a fundamental right, but it just happens to survive strict scrutiny analysis. As both this Court and the Supreme Court have clearly indicated, however, there is no basis in the law for such a theory, and appellants predictably do not cite any cases to support it. In short, appellants have no fundamental right to vote in a principal party's primary election.

Working from the premise that there is no fundamental right to vote in the primary elections of a political party to which one does not belong, the question arises whether the State's enunciated policies and promulgated laws somehow transform a previously non-fundamental "desire" into a fundamental right,[17] *viz.*, the fundamental right to vote in the primary election of a political party to which one does not belong when the election laws permit the election of judges who (1) are not affiliated with the party whose primary they win; (2) may cross-file as candidates in both parties; and (3) will have no party designation by their names on the general election ballot.

---

**17.** In *California Democratic Party v. Jones*, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000), the Supreme Court noted:

"As for the associational 'interest' in selecting the candidate of a group to which one does not belong, that falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest. It has been described in our cases as a 'desire'—and rejected as a basis for disregarding the First Amendment right to exclude."

*Id.* at 573 n. 5, 120 S.Ct. at 2407 n. 5.

■ We see no reason why such a transformation would take effect. While our answer might be different had the State established a truly nonpartisan election system (such as that laid out in Title 8, Subtitle 8 for the election of school board members), we have no occasion to decide that in the case *sub judice* because, as we have already pointed out, the procedure for electing judges remains a partisan one in form and in substance. Having recognized the legitimate interest of the State in a policy of keeping partisanship out of judicial elections as far as possible without abandoning the long-established infrastructure of political party primaries, we conclude the State's attempts to achieve this goal do not violate the equal protection provisions of either the Maryland or Federal Constitutions simply because some voters who decline to join a political party nevertheless wish to vote in that party's primary. In the absence of the provisions in the election law that set judicial elections apart from other partisan ones, appellants had no fundamental right to vote in the party's primaries; we do not see why the presence of them should entail a wholly new and unheard of fundamental right to vote.

CATHELL and HARRELL, JJ., Concur.

BELL, C.J. and ELDRIDGE, J., Dissent.

Concurring opinion by CATHELL, J.

I reluctantly concur with the result reached by the Court, based as it is on the limited issues as presented by the parties. Because they asserted that the process was intended to be nonpartisan, and they did not challenge the partisan nature of the elections themselves, their arguments necessarily fall before the finding of the Court that the election process for circuit court judges, in actuality, is partisan.

Because of the way the issues were presented, we are not able to address in this case the question of the constitutionality of partisan elections for circuit court judges. That issue, as I see it, must await another challenge. I note that, in my view, a required process for the election of judges that de-

pends upon party affiliation, and that permits any person, whether or not affiliated with any party, to be a candidate in each party's primary process, but then denies him or her the right to vote for themselves in the election that would place them upon the ballot in the general election, raises serious questions especially considering the provisions of Article I, section 1 of the Maryland Constitution that provides in relevant part *"Every* citizen ... who is a resident of the State, *shall* be entitled to vote ... at *all* elections to be held in this State." (emphasis added). In my view, this constitutional language is absolutely clear any construing language in *Hennegan v. Geartner,* 186 Md. 551, 559, 47 A.2d 393, 396 (1946) to the contrary not withstanding.[1] Upon proper challenge, it seems to me that this Court would be hard pressed to hold that an election (even a primary) conducted by State officials in a State facility, on ballots provided by the State, at times designated by the State, with the qualifications of the voters vis-a-vis registration created by the State—is not a State election, regardless of what party's primary it may *also* be. The fact that it may be a "shared" election does not make it any less a "State Election." If the political parties want protection from independent voters—they should hold their own primary elections and not have the State conduct them as State elections. In my view, the Federal constitutional provisions and the cases interpreting them, are not controlling in light of Maryland's explicit constitutional requirements for *all* State elections. If the parties want private primaries, let them hold their own—and pay for them as well.

---

1. The issue in *Hennegan* did not involve the election of circuit court judges, and the court there was not addressing the present situation where the State interprets the law to prohibit a candidate from voting for himself. In my view, the State does not have to regulate and conduct party primaries, but if it does it makes them State elections. In 1945, the advent of independent voters was not as pervasive as it is now. To apply the language of *Hennegan* to the conduct of judicial elections is no longer *de minimus* (a term used by the *Hennegan* court); it disenfranchises a substantial number of the State's citizens from participating in what is, because of State involvement, a "State" election for important offices. If necessary I would reject that language in *Hennegan.*

Moreover, given the increasingly large numbers of voters who chose to refuse to identify with either of the major political parties, the current process appears, at least facially, to disfranchise a large number of voters from participating in an important step in the process. In my view within days of the issuance of the opinions in this case, interested parties will be preparing the documentation necessary to challenge the constitutionality of partisan judicial elections that are conducted in the manner such as that used in Maryland especially considering the provisions of our own Constitution.

While I agree completely with Judge Raker's analysis for the Court that judicial elections for circuit court judges are actually partisan, that analysis conflicts with what I, and I imagine most observers of the judicial election process, had previously supposed. Moreover, I believe that the general voting populace, via the constant stream of news articles during every election cycle, heretofore have believed that the process was intended to be nonpartisan. As likely, members of the Legislature may have believed that nonpartisanship in judicial elections existed. Thus, I think, the issue of whether such elections should be partisan or nonpartisan, is a matter of public policy that should now be re-examined.

It may well be that the Legislature may want to address the issues raised by the opinions filed in this case, in order to avoid the uncertainties that will be created by future last minute, inevitable, constitutional challenges to this partisan election procedure for circuit court judges. Absent legislative actions resolving the issues, it is naive to believe that the issues are going away.

Concurring Opinion by HARRELL, J.

I write separately (and briefly) to record my semantical disagreement with the Court's description of the primary election process for Circuit Court judgeships in Maryland as "partisan". The Court's opinion makes a better case for

labeling that process, at worst, as bipartisan [1] or multi-partisan. Even better judgment, in my view, would be shown if the Court avoided volunteering any alternative label.[2]

Whatever the wisdom animating the requirement that Circuit Court appointees/incumbents run in potentially contested elections, the overall regulatory scheme governing that primary election process is *sui generis* when compared to other types of elective State office. For instance, for what other potentially contested office are certain candidates' campaign conduct regulated by an enforceable professional code of ethical conduct, such as provided by Maryland Rules 16–813 (Canon 5, B) and 16–814 (Canon 5, B), the requirements of which trump otherwise permitted "partisan political activity allowed by law"?

I believe it sets entirely the wrong tone for this Court unnecessarily and without qualification to describe as "partisan" a process that is designed to foster other than a traditional "partisan" approach to campaign conduct in a judicial race.[3] What appears to occur in contested judicial elections in other States, which seem to be conducted with much of the indicia of truly partisan campaigns,[4] need not occur also in

---

1. Md.Code (2003), Election Law Art., § 1–101(kk), contemplates that there may be no more than two "principal political parties" at a given time. Moreover, as the Majority points out, a candidate may cross-file in the primaries of both principal political parties, regardless of the candidate's party affiliation or lack thereof. Maj. op. at 708–09, 862 A.2d at 7–8.

2. Incorporating appellants' concession within their relevant argument in the present case, the Court need resolve only whether the process is non-partisan. If it is not, as the Court declares (with which conclusion I concur), we need say no more.

3. In expressing this view, I am a pragmatist temporarily channeling for an idealist.

4. *See* newspaper article in *Chicago–Sun Times* of 25 August 2004 (*http://www.suntimes.com/output/news/25ads.html*) that the Illinois State Bar Association will monitor judicial campaigns "in an effort to add civility to a southern Illinois Supreme Court race that has generated a lawsuit, allegations of garbage picking and a television commercial exhorting voters to get rid of 'bad judges.' " At the news conference

Maryland or, at least, we need not encourage an evolution along those lines. In my judgment, the labeling of judicial elections as partisan ultimately works against the Judiciary's aspiration of retaining the trust and confidence of the general public, a premise upon which its very existence depends. We rather should engage in mitigation of politicization of judicial elections In this case, we should not appear to recognize judicial elections as truly partisan ones.[5] It suffices to declare, for the purposes of the present case, that such elections are not non-partisan.

Dissenting Opinion by BELL, C.J. which ELDRIDGE, J., joins.

The issue that this Court decides today is a constitutional challenge to the procedure long employed in Maryland in the election of Circuit Court judges. Specifically, the question is whether the Circuit Court for St. Mary's County correctly refused to order the St. Mary's and Anne Arundel County Boards of Elections to conduct new primary judicial elections, holding that the Maryland General Assembly intended that primary judicial elections be "partisan" in nature and application. This Court, which heretofore, by *per curiam* order, had affirmed that court's denial of the preliminary injunction sought by Michael B. Suessmann, *et al.* (the appellants) to

---

announcing the bar associations' intentions, two Supreme Court candidates, Democrat Gordon Maag and Republican Lloyd Karmeier, signed pledges "disavowing advertisements that impugn the dignity of their opponent or the judiciary." The candidates denied having anything to do with the negative commercials, which were run by third party groups. *See also* article in Columbus, Georgia's 17 July 2004 *Ledger–Enquirer* (http:// www.ledger-enquirer.com/mld/ledgerenquirer/news/local/ 9176624.htm) reporting that a Georgia Superior Court race has turned "into a campaign cat fight ... filled with sniping letters, pre-dawn fusses on live TV and name-calling that would be more at home on a preschool playground."

5. Even the U.S. Supreme Court majority in *Republican Party of Minnesota v. White*, 536 U.S. 765, 783, 122 S.Ct. 2528, 2539, 153 L.Ed.2d 694 (2002), expressed a sentiment of reservation when it stated that "we neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office."

invalidate the March 2, 2004 primary election, also explains the reasons for that order. I join that portion of the opinion addressing the latter issue, that explains why we refused the preliminary injunction. On the other hand, my answer to the former issue is "no." There is, in fact, clear case law evincing Maryland's public policy on this point, that judicial elections should be, and remain, removed from "partisanship," and, for that reason, I disagree with the Circuit Court and the majority and respectfully dissent.

Maryland Code (2003) § 5–203 of the Election Law Article provides:

"(a) *Voter registration required.*—

"(1) This subsection does not apply to a candidate for:

"(i) President or Vice President of the United States; or

"(ii) any federal office who seeks nomination by petition.

"(2) Unless the individual is a registered voter affiliated with the political party, an individual may not be a candidate for:

"(i) an office of that political party; or

"(ii) except as provided in subsection (b) of this section, nomination by that political party.

"(b) *Party affiliation—Exception for judicial and county board of education candidates.*—The requirements for party affiliation specified under subsection (a) of this section do not apply to a candidate for:

"(1) a judicial office; or

"(2) a county board of education."

Candidates for judicial office and for county boards of education, thus, are expressly exempt from compelled party affiliation.[1] Stated differently, the Legislature, by this Act,

---

1. Curiously, the majority challenges the appellants' assertion, based on Maryland Code (2003) § 5–203(b) of the Election Law Article, that "[u]nique among candidates for public office, Maryland requires politi-

has prohibited political parties from excluding judicial and board of education candidates, whatever their political affiliation, from their ballots.

Consistent with § 5–203(b), and, indeed, building on it, is § 5–706(a). Providing that the prohibition against the name of a candidate defeated in a primary election appearing on the ballot in the general election "does not apply to ... a candidate for the office of judge of the circuit court," it permits a judicial candidate to "cross-file" in the primary elections of the principal political parties.

In addition, § 9–210(g) provides:

"(g) *General elections—Party designation.—*

"(1) Except for contests for judicial office or an office to be filled by nonpartisan election, the party affiliation of a candidate who is a nominee of a political party shall be indicated on the ballot.

"(2) (i) A candidate who is not a nominee of a political party or affiliated with a partisan organization shall be designated as an 'unaffiliated.'

"(ii) A candidate who is affiliated with a partisan organization shall be designated under 'other candidates.'

"(3) The names of candidates for judge of the circuit court or for a county board of education, and the names of incumbent appellate judges, shall be placed on the ballot

---

cal parties to permit candidates for judicial office to run in the primary even if they are not members of the party," stating:

"While we express no opinion as to whether this assertion is correct, we note that appellants have cited, as direct support, authority that does not stand for their proposition. A careful reading of § 5–203(b)(1) reveals that it *exempts* judicial candidates from the requirement that they be registered members of the party nominating them in its primary; it does not *require* political parties to accept judicial candidates who are unaffiliated with the party in their primaries." 383 Md. 697, 726–27 n. 15, 862 A.2d 1, 18 n. 15 (2004). That is indeed a fine distinction and one that, if correct, would render § 5–203(b) totally nugatory. We do not construe statutes so that they have no meaning. *See Gillespie v. State,* 370 Md. 219, 222 804 A.2d 426, 428 (2002), *Montgomery County v. Buckman,* 333 Md. 516, 523–524, 636 A.2d 448, 452 (1994).

without a party label or other distinguishing mark or location which might indicate party affiliation."

Pursuant to this provision, judicial candidates do not appear on the general election ballot as the nominee of any party or with any party designation.

The necessary intent, and resulting cumulative effect, of these provisions is to remove partisanship "as far as possible," *see Smith v. Higinbothom,* 187 Md. 115, 133, 48 A.2d 754, 763 (1946), from the judicial election process, at the primary level and beyond. At the very least, the Legislature intended that this aspect of the process, candidate qualification, not be partisan.

There is another, more practical effect: permitting unaffiliated candidates to run in *any*[2] political party's primary, in reality, compels them to run in each such primary. A candidate that foregoes the opportunity to participate in as many primaries as may be held and as many nomination methods as there are parties necessarily runs at a distinct disadvantage to his or her competitors, having thereby afforded him or herself only one chance of making it to the general election, rather than the two or more chances otherwise available. Moreover, opening up the primary election process as to candidates for judicial office and precluding political parties from completely controlling the process insofar as who is permitted to compete, rather than being reflective of partisanship, is consistent with the opposite focus.

This Court has commented on the public policy of this State with regard to the place of partisanship in judicial elections. *See Smith v. Higinbothom,* 187 Md. at 133–134, 48 A.2d at 763. Noting that "[t]he law ... provides that the names of all

---

2. Maryland Code (2003) § 1–101(kk) of the Election Law Article defines "Principal political parties" as "the majority party and the principal minority party." The reference in § 5–203(b) to "the requirements of party affiliation" is not so limited. Thus, a judicial candidate may, under that provision, be a candidate for an office, or nomination, of any political party, not simply of the principal political parties. This answers Judge Harrell's argument that the judicial election process for Circuit Court judges is "at worst ... bipartisan."

candidates for Judge shall be placed on the ballots or voting machines without any party label or other distinguishing mark or location which might indicate the party affiliation of any such candidate" and that political party affiliation is not required for nominations made at primary judicial elections, the Court observed:

> "It can now be said that the public policy of the state is to keep partisanship out of the election of Judges as far as possible, and to retain in the judiciary those Judges who have demonstrated their integrity, wisdom and sound legal knowledge."

*Id.*[3]

The reasons supporting the public policy of keeping, as much as possible, partisanship out of the election of judges and, thereby, maintaining a process where quality and merit are the predominant concerns, are obvious. A non-partisan judiciary more likely will be an independent judiciary, Maryland Rule 16–813, Code of Judicial Conduct, Canon 1 ("An independent and honorable judiciary is indispensable to justice in our society. A judge should observe high standards of conduct so that the integrity and independence of the judiciary may be preserved."), and one characterized by integrity, wisdom and legal learning. *Smith v. Higinbothom,* 187 Md. at 123, 48 A.2d at 758. Such a judiciary inspires greater public trust and confidence and is less likely to be the subject of controversy. Moreover, "[a] non-political judiciary that will interpret fairly the law and administer justice without political taint or touch is more vital to the community than anything else. A good judge is entitled to re-election regardless of his

---

**3.** If we were correct that the goal of judicial elections is the retention of "those Judges who have demonstrated their integrity, wisdom and sound legal knowledge" and, in addition, it is true that insuring the election of such judges even in the first instance, is of critical importance, pronouncing judicial elections to be partisan, with the effect that only affiliated voters may participate in the primary process, would result in the irony that a non-affiliated candidate for the Circuit Court could run in a county primary election, but not be able to participate in that election as a registered voter of the state, even to vote for him or herself.

party affiliation; a poor judicial candidate, pushed by the politicians, should never be supported for party reasons." *Id.* at 124, 48 A.2d at 759, quoting Johnson, Kent, Mencken and Owens, The Sunpapers of Baltimore, 144, 145.

Consistent with the notion of a non-political, non-partisan judiciary and judiciary election process are the restrictions prescribed for judicial candidates by the Maryland Canon's of Judicial Conduct. *See* Md. Rule 16–813. Canon 5B, pertaining to the "Political Conduct of a Judge Who is a Candidate" is instructive on the meaning of the term "partisan," in the context of a judicial election. It makes clear the restrictions on the expressly political and partisan conduct in which judges are permitted to engage, as compared to that of other candidates engaged in partisan elections. Canon 5B states:

"B. Political Conduct of a Judge Who Is a Candidate. A judge who is a candidate for election, re-election, or retention to judicial office may engage in partisan political activity allowed by law with respect to such candidacy, except that the judge:

"(1) should not act as a leader or hold any office in a political organization;

"(2) should not make speeches for a political organization or candidate or publicly endorse a candidate for non-judicial office;

"(3) should maintain the dignity appropriate to judicial office;

"(4) should not allow any other person to do for the judge what the judge is prohibited from doing;

"(5) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office, announce the judge's views on disputed legal or political issues, or misrepresent the judge's identity, qualifications, or other fact."

The Commentary to Canon 5B (2) proscribes a judge running for office publicly endorsing a candidate for another public office by having the judge's name on the same ticket.

The limitations on the judicial candidate's political or "partisan political activity," reflected in the 5 exceptions, make clear that the partisanship referred to, and permitted, is limited to the judge's own candidacy and essentially consists of being allowed to attend political dinners and other functions, which provide the judge with a forum, and enable him or her, to advocate, in a restricted and limited way, on his or her own behalf. The American Heritage College Dictionary, 3rd Edition, defines a "partisan" as "A fervent, sometimes militant supporter or proponent of a party, cause, person or idea." By this definition, a person who is precluded from making speeches at political events or even publicly endorsing a non-judicial candidate, hardly could be deemed a "partisan."

Sections 5–203(b) and 5–706(a) are contained in Title 5 of the Election Law, pertaining to candidate qualification. And although § 9–210(g) is in Title 9, pertaining to voting, its focus is on the candidate. As I have shown, the General Assembly has been clear, the election process for judges insofar as candidate qualification is concerned, is not partisan. But the election process consists of more than candidate qualification; to be complete, account must be taken of the participation of the voters, the critical players in the system. Therefore, an election process that is completely non-partisan in the candidate selection aspect still may not be completely non-partisan where the voter participation proceeds on a partisan basis.

In this case, contrary to the way in which it handled the candidate side of the process, and unlike its treatment of the election process for county boards of education, in which the General Assembly was specific as to who could vote in those elections,[4] the General Assembly has been completely silent as

---

4. Section 8–802 provides:

"(a) *In general.—*
"(1) (i) Members of boards of education shall be elected on a nonpartisan basis.
"(ii) In a primary election to nominate board of education candidates, any registered voter of the county, regardless of party affiliation or lack of party affiliation, is eligible to vote in those contests for nomination.

to whether voting in the judicial election process was intended to be non-partisan, whether the voters were expected to participate on a non-partisan basis. This omission renders ambiguous both the legislative intent and the statutory scheme reflecting that intent. Maryland law is clear, when legislative intent is not discernable from the clear language of a statute or a statutory scheme, we seek to discover it in extraneous sources. Given the importance of the integrity of the judicial election process to the existence in fact, and in perception, of an independent and a fair and impartial judiciary, I resolve the ambiguity in favor of non-partisan voter participation, that is, permitting all registered voters to participate at the primary election stage in the selection of the final candidates for judicial office.

The majority reaches the opposite conclusion. Characterizing Maryland's as a "meticulously crafted judicial elections process," 383 Md. 697, 726–27, 862 A.2d 1, 18, it concludes that the process "evinc[es] a policy of nonpartisanship in judicial elections while nevertheless keeping the election process itself an inherently partisan affair,[ which] rel[ies] on the long-established infrastructure of a political party primary to accommodate the election of candidates it desires to be selected on bases apart from partisan politics." *Id.*[5] More particularly, the majority is persuaded that the three provisions in the

---

"(2) Candidates for election to boards of education shall, without party designation or regard to party affiliation:
"(i) file certificates of candidacy;
"(ii) be certified to the ballot;
"(iii) appear on the ballot;
"(iv) be voted on; and
"(v) be nominated and elected.
"(b) *Exception.*—This section does not apply to candidates for nomination or election to a board of education if Title 3 of the Education Article requires a partisan election."
This section is contained in Subtitle 8 of Title 8, entitled "Boards of Education."

5. I, like the appellants and the majority, *see Suessmann v. Lamone,* 383 Md. 697, 721–22, 862 A.2d 1, 15–16 (2004), acknowledge that political parties have a First Amendment right of association, upon which the State may not infringe. *See California Democratic Party v. Jones,* 530

Election Law Article that mention "nonpartisan" do not support the appellants' argument that the General Assembly established a system of nonpartisan judicial elections and, in fact, "strongly suggest the opposite view." *Id.* at 723–24, 862 A.2d at 16–17.

Not unexpectedly, the majority relies on § 8–802, which, as I have already pointed out, prescribes the election of county school board members "on a nonpartisan basis," subsection (a)(1)(i), and provides for the participation in these elections of all registered voters, whatever their party affiliation or lack thereof. Subsection (a)(1)(ii). It opines:

"It seems obvious that, just as § 8–802(a)(1)(i)'s purpose is to mandate a nonpartisan general election, § 8–802(a)(1)(ii)'s purpose is to mandate a nonpartisan primary election. Thus, § 8–802(a)(1)(ii) provides us with a useful statutory depiction of what is meant by a nonpartisan primary. The inescapable conclusion is that when the State truly establishes a nonpartisan primary, the primary is characterized by the fact that *unaffiliated voters are eligible to vote in it.* Indeed, the statute implies that a nonpartisan primary is defined by the ability of unaffiliated voters to vote in the primary. If this be so, then the political primaries nominating circuit court judges cannot, by definition, be nonpartisan since unaffiliated voters are ineligible to vote in them."

*Suessmann v. Lamone,* 383 Md. 697, 723–25, 862 A.2d 1, 16–17.

U.S. 567, 574, 120 S.Ct. 2402, 2408, 147 L.Ed.2d 502, 509–510 (2000); *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 214–215, 107 S.Ct. 544, 548, 93 L.Ed.2d 514, 523 (1986). On the other hand, I, like the majority, *id.* at 708, 862 A.2d at 7, citing *Hennegan v. Geartner,* 186 Md. 551, 556, 47 A.2d 393, 395 (1946), recognize that "the Legislature has power to create and regulate primary elections, subject only to such prohibition as may be found in the State Constitution, and subject as to Congressional elections to any prohibitions in the Federal Constitution." The first amendment rights of the political parties are not at issue in this case. Nor is there any issue in this case concerning the importance of the State's interest in regulating judicial elections.

In addition, the majority relies on § 8–802(a)(2)(i)–(v). As to it, the majority contrasts the affiliation provision for judicial candidates with that for candidates for county boards of education, noting that the latter are more detailed and specifically pertain to "all aspects of the election." *Id.* at 724–25, 862 A.2d at 17. It also states:

"In contrast to vacancies created by board member candidates after they have won the primary but before the general election, vacancies on the ballot occurring after judicial candidates have won the primary election, vacancies on the ballot occurring after judicial candidates have won the primary election are filled by the central committee of the same political party of the individual vacating the nomination. Compare § 8–805 [6] with § 5–1004 [7]. In sum, the Election Law Article contemplates key features distinguishing nonpartisan board of education elections from the elections for judicial candidates, signaling, at the very least, that its understanding of nonpartisan does not comport with appellants' view."

I do not believe that the more detail in the case of the board of education member than in the case of the judicial officer affects very much, if at all, the comparability of the candidate

---

**6.** Section 8–805, "Vacancies in nomination," provides:

"(a) *Nominee who dies, declines, or is disqualified.—*

"(1) If, after the primary election but before the general election, a nominee dies, declines the nomination, or becomes disqualified before the ballots are printed or at a time when the ballots can be reprinted, the name of the nominee may not appear on the ballot. "(2) If the number of remaining nominees is less than the number of offices to be filled, a new nominee shall be appointed in the same manner as provided in the Education Article for filling a vacancy on the board of education.

"(b) *Votes cast for name remaining on ballot.* If a nominee dies, declines the nomination, or is disqualified after the ballots are printed and too late for the ballot to be reprinted, and if that nominee receives sufficient votes to have been elected, the office shall be deemed vacant and shall be filled as if the vacancy had occurred during the term of office."

**7.** Section 5–1004 requires a vacancy in nomination for an office that is entirely in one county to be filled by that county's central committee of the party of the individual vacating the position.

qualification aspect of the election process or the legislative intent to broaden the candidate base and deflect the partisanship. The majority is simply wrong with regard to judicial vacancies being filled by State central committees. While the majority correctly points out that Maryland law requires each political party to have a State and County Central Committee, see §§ 4–201 and 4–202, the filling of vacancies in the office of Circuit Court judge is controlled by the Maryland Constitution and is entrusted to the Governor, rather than directly to political parties. Article IV, Section 5 of the Maryland Constitution provides:

"Upon every occurrence or recurrence of a vacancy through death, resignation, removal, disqualification by reason of age or otherwise, or expiration of the term of fifteen years of any judge of a circuit court, or creation of the office of any such judge, *or in any other way*, the Governor shall appoint a person duly qualified to fill said office, who shall hold the same until the election and qualification of his successor. His successor shall be elected at the first biennial general election for Representatives in Congress after the expiration of the term of fifteen years (if the vacancy occurred in that way) or the first such general election after one year after the occurrence of the vacancy in any other way than through expiration of such term. Except in case of reappointment of a judge upon expiration of his term of fifteen years, no person shall be appointed who will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time when his successor would have been elected." (Emphasis added)

I do not disagree that a characteristic of nonpartisanship in elections is that unaffiliated voters are not excluded, but rather are permitted to vote in it. Of course, it is whether all registered voters may participate in the primary election of Circuit Court judges that is at issue in this case. That question is not answered by a provision that deals specifically with boards of education elections. That the General Assembly was quite specific as to who was eligible to vote in those elections, does not establish the opposite conclusion, that only

affiliated voters may vote for Circuit Court judges, especially since the right of the affected political parties to control who runs in their primary elections has been restricted with respect to those races and, more important, given the importance of insuring the integrity of such races. Thus, I reject the majority's assertion that

> "When the State wishes to establish a nonpartisan election, it has proven that it knows how by its creation of the explicitly nonpartisan school board elections. It has not done so in the context of judicial elections for the circuit courts, which remain, despite appellants assertions to the contrary, partisan affairs."

*See Suessmann,* 383 Md. at 727–29, 862 A.2d at 18–20.

Moreover, in relation to the purely political contests they regulate, judicial elections are significantly different; it does not follow that the rules with regard to who may vote for judicial candidates in those purely political contests were intended to be applied to those judicial candidates or contests. In my view, in short and at best, the Legislature was, and has remained, silent on the issue. Maryland law is clear, legislative silence on a particular subject is not evidence, one way or the other, of legislative intent as to that subject. *See Jones v. State,* 336 Md. 255, 271 647 A.2d 1204, 1212 (1994); *Stouffer v. Staton* 152 Md.App. 586, 604 833 A.2d 33, 34 (2003).

To be sure, it can not be gainsaid that § 9–206(a)(5), in prescribing the format of the primary ballot, requires that there be printed at the top of each primary election ballot, "the name of the political party or the words 'nonpartisan ballot,' as applicable," and that judicial candidates appear on party ballots, rather than nonpartisan ballots. Nor do I dispute, or could I, that judicial candidates, consistent with the requirements of § 9–210(a), which enumerate the specific arrangement of the general election ballots, are allotted the sixth spot on such ballots, while the ninth is reserved for "offices filled by nonpartisan election." I do not find these provisions dispositive.

Permitting candidates, who are not affiliated with a party, to run in that party's primary is antithetical to partisanship; it limits the ability of party or partisan considerations to dominate or determine candidate eligibility. Moreover, coupling the non-affiliation provision with one for cross-filing in competing primaries and for participation in other party activities for which heretofore party affiliation was required, further undermine and limit partisanship and the influence of party. Partisanship and party influence are further reduced by not requiring that the candidates be identified by party labels in the general election, even though presumably a party nomination has occurred. These various provisions draw a sharp distinction between the judicial candidate and other candidates for office, those for offices in the political branches of government.

Indeed, the manners in which the General Assembly has differentiated judicial candidates from those that are clearly partisan and its persistence in this approach, even after this Court's observation, in *Smith v. Higinbothom*, of the intended effect of those differentiations, are, I repeat, clear evidence of its desire to limit the partisanship associated with the elections for other offices. The issue that this case presents, and the only one, presented for the first time, is how the General Assembly intended to ensure that this limitation of partisanship, the only conceivable benefit and result that could have been contemplated by these differentiations, and the apparent purpose for them, is achieved. More than the placement of provisions in a statutory scheme is required to answer the intent question. Critical to its resolution is, in fact, the benefit sought and the comparison of the impact on that benefit by each approach.

While expanding the candidate eligibility aspect of the judicial election process does reduce the partisanship of the process, it does not reduce it "so far as possible." The best result may be expected to be achieved when the broadest possible voter base is used to select the ultimate winner. The more eligible voters, and therefore citizens, are allowed to "vet" the judicial candidate for integrity, learning and wisdom, without regard to party or partisan affiliation or consider-

ations, the more the process is rendered non-partisan. It is not at all clear to me that the Legislature was intent to go only part way in shielding the judicial process from partisanship. That it did not do expressly in the case of the judicial elections process what it did expressly in the case of the county boards of education does not establish that it intended the opposite with respect to voter participation. This is, to me, an especially compelling conclusion since the integrity and independence of the judiciary, such that it enjoys the full (at least to the greatest extent possible) trust and confidence of the public it serves, is at least as important as ensuring an effective and efficient education system.

There is one additional matter which warrants a comment. Article I, § 1, of the Maryland Constitution provides in pertinent part as follows (emphasis added):

> "*Every citizen* of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides *at all elections to be held in this State.*"

If the issue had been raised in this case, a persuasive argument could have been made that Article I, § 1, precludes the exclusion of unaffiliated registered voters from primary elections for Circuit Court judges. A Democrat or Republican primary, limited to Democrat or Republican registered voters who are choosing their party's nominee, may well not be an "election" within the meaning of Article I, § 1. Nonetheless, when that state-regulated primary is open to candidates for judgeships regardless of party affiliation, it is no longer simply a "party" function. With regard to candidates for the office of Circuit Court judge, it very likely is an "election" within the meaning of Article I, § 1.

I dissent.

Judge ELDRIDGE joins in the views herein expressed.